UNITED STATES of America,
Plaintiff–Appellee,

v.

Lance Henry WILSON, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Leonard E. BRISCOE, Sr.,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Maurice David STEIER, Defendant–
Appellant.

Nos. 93–3053 to 93–3055.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 6, 1994.

Decided June 17, 1994.

As Amended June 17, 1994.

Barry W. Levine argued the cause, for appellant Briscoe. With him on the briefs were Elaine Metlin and David B. Killalea.

Theodore V. Wells, Jr., of the bar of the U.S. Court of Appeals for the Third Circuit, pro hac vice, by special leave of the Court, argued the cause, for appellant Wilson. With him on the briefs were Martha P. Rogers and Robert L. Krakower.

Maurice David Steier argued and filed briefs pro se.

Bruce C. Swartz, Deputy Independent Counsel, argued the cause for appellee. With him on the brief were Arlin M. Adams, Independent Counsel, Roscoe C. Howard, Jr., Ltd. and Dianne J. Smith, Associate Independent Counsels, and Eric H. Holder, Jr., U.S. Atty.

Before WALD, EDWARDS, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This case arose out of an investigation into abuses and mismanagement at the Department of Housing and Urban Development ("HUD") initiated by Congress in 1989. In March 1990, on petition of the Attorney General, a special division of this court appointed an independent counsel pursuant to the Ethics in Government Act of 1978 ("Ethics Act" or "Act"), § 601(a), as amended, 28 U.S.C. § 593(b) (1988), to pursue the investigation. At the close of the investigation, defendants were prosecuted for involvement in an alleged bribery and kickback scheme to obtain HUD Urban . Development Action Grants ("UDAGs") for real estate developments in Florida and Texas. Appellants were acquitted on all but the illegal gratuities counts, 18 U.S.C. § 201(c)(1)(A), which are now challenged on appeal. For reasons stated below, we reverse the conviction of Lance Henry Wilson because the illegal gratuity charge was brought more than five years after his commission of the alleged offense and was thus time barred under the applicable statute of limitations, 18 U.S.C. § 3282, which defendant Wilson had not waived. After a searching review of appellant Briscoe's and appellant Steier's many challenges, we affirm their convictions, addressing in detail only those contentions we believe merit elaboration.

## I. BACKGROUND

In 1989, after Congress had conducted hearings on alleged abuses and mismanagement at HUD, the Attorney General, acting pursuant to the Ethics Act, § 601(a), as amended, 28 U.S.C. § 592(c), "appl[ied] to the division of [this] court for the appointment of an independent counsel." *Cf. Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (upholding constitutionality of independent counsel provisions). On March 1, 1990, the special division granted the Attorney General's application and several months later expanded the independent counsel's investigative and prosecutorial jurisdiction to cover any federal criminal violations committed by Housing Secretary Samuel R. Pierce, Jr., or others in relation

to, *inter alia*, the administration of the UDAG program, as well as any "additional matters related to the [i]ndependent [c]ounsel's prosecutorial jurisdiction referred to [i]ndependent [c]ounsel by the Attorney General." *In re Samuel R. Pierce, Jr.* at 2 (D.C.Cir.Sp.Div. No. 89–5 July 1, 1990).

DuBois Gilliam, the former Deputy Assistant Secretary for Program and Policy Development and Evaluation at HUD, who was at the center of the alleged criminal activities, testified before Congress pursuant to a grant of immunity. On May 31, 1990, he agreed to cooperate with the Office of the Independent Counsel ("OIC"), and one month later he further agreed to cooperate with the U.S. Attorney for the Southern District of Florida ("USAO") who had been conducting an investigation into local corruption involving the Florida and Texas real estate developer Leonard E. Briscoe. Gilliam alleged that, while he was at HUD, he accepted false "firm financial commitment letters" prepared by Lance Henry Wilson of Paine-Webber, Inc. who had previously been Secretary Pierce's Executive Assistant. These letters would attest that the private developer, *i.e.*, Leonard E. Briscoe, had secured a firm private commitment to finance and carry out the proposed UDAG project prior to preliminary HUD approval. Without evidence of such a financial commitment for any given project, HUD would not approve UDAG matching funds.

According to the government, representatives of the OIC and the Florida USAO met in July, 1990, and decided to coordinate their investigative efforts. The Florida USAO would continue its ongoing examination of alleged illegal activities centered around Briscoe's Florida activities, while the OIC would focus on the scheme to obtain UDAG funds with the help of false firm financial commitment letters.

As the investigation in the Southern District of Florida finalized, it became clear that forthcoming indictments would overlap considerably with the subject matter of the OIC's jurisdiction. On June 12, 1991, the OIC authorized the USAO in writing to seek the contemplated indictments. That same day the Florida U.S. Attorney obtained two indictments, the first charging a kickback scheme with a local contractor (not at issue here) and the second charging that Briscoe and his attorney M. David Steier had conspired to bribe and provide illegal gratuities to DuBois Gilliam to obtain approval for UDAG funding for three Florida projects, the Wedgewood Plaza Apartments, Wedgewood Plaza Mall, and Palm Glade Apartments, in violation of 18 U.S.C. §§ 2, 201(b)(1)(A), 201(b)(1)(B), 201(c)(1)(A) & 371.

Barely one month later in Washington, D.C., the OIC sought its first indictment of Briscoe charging various crimes in connection with the firm financial commitment letters for the Wedgewood Plaza Mall project. This indictment, however, was to be superseded three times. On November 21, 1991, the District of Columbia grand jury returned the first superseding indictment against Briscoe, adding charges relating to a project in Ft. Worth, Texas, known as Overton Ridge. On January 14, 1992, the D.C. grand jury returned a second superseding indictment adding charges in connection with the Palm Glade project and naming Lance Wilson as a defendant for the first time. The second superseding indictment charged Wilson for the first time with conspiracy and illegal gratuity. (Briscoe was alleged to have participated in, but was not indicted for the conspiracy with Wilson.) Two weeks later, Leonard Briscoe, without objection by his co-defendant Steier, successfully moved to transfer both Florida cases to the District of Columbia.

Finally, on May 19, 1992, the D.C. grand jury returned a third superseding indictment, adding Briscoe and Steier to the conspiracy count. Shortly thereafter, the government successfully moved to consolidate the OIC and Florida indictments and set them down for trial.

The government's case was built on the theory that beginning in 1985, Gilliam (an unindicted co-conspirator) agreed to accept false firm financial commitment letters prepared by Wilson, then at PaineWebber. Gilliam would make certain that HUD awarded UDAG funds (sometimes in excess of HUD staff estimates) to the projects developed by Briscoe. Attorney Steier allegedly set up a

company, "Northwest Investment Corporation," for the purposes of surreptitiously funneling illegal payments from Briscoe to Gilliam.

After a three month jury trial Briscoe was convicted on the two illegal gratuity counts which originated in the Florida USAO indictment and was acquitted on all other counts; Wilson was convicted on one illegal gratuity count which first appeared in the OIC's second superseding indictment and acquitted of the remaining 21 counts; Steier was convicted of one illegal gratuity count originating in the Florida indictment and acquitted of the remaining five charges in which he was named as a defendant. This appeal followed.

## II. ANALYSIS

A. *Challenge Under the Ethics in Government Act*

The Ethics in Government Act, § 601(a), 28 U.S.C. § 597(a), provides:

> Whenever a matter is in the prosecutorial jurisdiction of an independent counsel or has been accepted by an independent counsel under section 594(e), the Department of Justice, the Attorney General, and all other officers and employees of the Department of Justice shall suspend all investigations and proceedings regarding such matter, except to the extent required by section 594(d)(1), and except insofar as such independent counsel agrees in writing that such investigation or proceedings may be continued by the Department of Justice.

Although the OIC for this case was established in March 1990, it was not until over fourteen months later, on the same day the Florida indictment was obtained, that the OIC for the first time authorized in writing the USAO's "investigation and, if appropriate, prosecution of ... a possible conspiracy among Leonard Briscoe, David Steier, and others to bribe a government official, DuBois Gilliam." Letter from Arlin M. Adams, Independent Counsel, to Dexter W. Lehtinen,

Office of the United States Attorney for the Southern District of Florida (June 12, 1991). Briscoe and Steier argue that, as a result, the Florida investigation was never duly authorized and the subsequent indictment was fatally flawed.

Appellants contend further that even if the written authorization of June 12, 1991, was not untimely, the OIC was not empowered to authorize a simultaneous investigation by the Department of Justice ("DOJ") that was anything more than peripherally related to the central matter within the jurisdiction of the OIC. Relying solely on a passage from the legislative history of the Ethics Act, they maintain that the Act would be frustrated by permitting the USAO to continue an investigation which substantially overlaps with the OIC's jurisdiction. They quote the Senate Report on the Ethics Act which noted that "it would be a total subversion of the intent of this chapter if the special prosecutor agreed to permit the Department of Justice to conduct any important or substantial portion of the investigation under the responsibility of the special prosecutor." S.REP. No. 170, 95th Cong., 1st Sess. 76 (1977), *reprinted in* 1978 U.S.C.C.A.N. 4216, 4292. *See* Brief for Appellant Briscoe at 10–11. In a related vein, they charge that the subsequent consolidation of the Florida and D.C. indictments for joint prosecution by the OIC and the DOJ also served to undermine the independence of the special prosecutor in violation of the Ethics Act.

■ Briscoe and Steier do not allege any specific harm incurred as a result of these events other than the fact of being indicted and convicted on the charges originating in the Florida indictment. They do not, for example, allege that the dual investigations effectively deprived them of defense resources, such as access to witnesses or other evidence, which Briscoe and Steier would have enjoyed in the absence of parallel investigations.[1] Nor do appellants allege that the

---

1. According to 28 U.S.C. § 594(f), the independent counsel "shall, except where not possible, comply with the ... policies of the [DOJ] respecting enforcement of the criminal laws." These policies provide guidance on such subjects as "dual prosecution, granting of immunity to witnesses, and other important matters respecting enforcement of criminal laws," and are "important in ensuring that there is some degree of uniformity and fairness of treatment involved in all prosecutions brought by the executive branch of the federal government." S.REP. No. 170, 95th

Florida USAO lacked the requisite authorization from within the DOJ to conduct the Florida grand jury proceedings. *See, e.g.,* 28 U.S.C. § 515(a); *cf. United States v. Prueitt,* 540 F.2d 995 (9th Cir.1976), *cert. denied,* 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780 (1977) (discussing standard for evaluating whether Attorney General has provided requisite appointment and direction under § 515(a)). The core of their claim is rather that upon appointment of the OIC, § 597(a) *withdrew* any authority the Florida USAO otherwise had to investigate and conduct grand jury proceedings regarding possible criminal activities involving Leonard Briscoe, and that, as a result, notwithstanding the OIC's written authorization on June 12, 1991, to legitimize the Florida indictments they are nonetheless fatally flawed. We reject that contention.

■■■ The central purpose of the special prosecutor provisions of the Ethics Act is to permit the effective investigation and prosecution of high level government and campaign officials. S.REP. No. 170, 95th Cong., 1st Sess. at 5–7, 1978 U.S.C.C.A.N. at 4221–23. Accordingly, the Ethics Act provides a special division of this court with the power to vest the prosecutorial authority of the United States in individuals who are beyond the sphere of presidential influence, and who are unencumbered by any conflicts of interest that might be expected to plague a DOJ attorney prosecuting his superiors. However, merely anointing a prosecutor from outside the incumbent Administration's realm of power obviously would not suffice to ensure that the independent prosecutor can effectively pursue his investigation. To shore up the special prosecutor's independence from the DOJ, then, the Act specifically requires the DOJ to "suspend all investigations and proceedings regarding such matter[s]" that have been assigned to the special prosecutor. As we recognized in *In re Sealed Case,* 829 F.2d 50, 56 (D.C.Cir.1987), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 753, 98 L.Ed.2d 765 (1988), the principal aim of this provision is to "prevent[ ] investigations by the Department of Justice which would duplicate and

possibly impede the work of Independent Counsel."

As reflected in the structure of the Act, the precise allocation of responsibility over every facet of the ensuing investigation cannot be chiseled in stone at the commencement of the special prosecutor's tenure. For example, upon application of the Attorney General to a special division of this court, it is the duty of that division to appoint and define the prosecutorial jurisdiction of the independent prosecutor. 28 U.S.C. § 593(b)(1). In defining the independent prosecutor's jurisdiction, the special division may include "all matters related to" the "subject matter with respect to which the Attorney General has requested the appointment of the independent counsel." *Id.* at § 593(b)(3). The special prosecutor may quite sensibly be authorized to investigate any potential co-conspirators of high level officials, even though they are not themselves Administration or campaign officials. *See also* S.REP. No. 170, 95th Cong., 1st Sess. at 64, 1978 U.S.C.C.A.N. at 4280. Clearly, then, the scope of a special prosecutor's investigatory jurisdiction can be both wide in perimeter and fuzzy at the borders.

■■■ Since the relationship between ongoing DOJ investigations and OIC inquiries may not be apparent from the very beginning of any given investigation, the Act provides a mechanism through which the OIC and the DOJ may clarify and fine-tune their respective jurisdictions. 28 U.S.C. § 594(e). The special prosecutor and the Attorney General may reassign matters to each other, and the Act does not require the intervention by the special division to effectuate mutually accepted reshuffling of investigative responsibilities. As the Senate Report noted:

[T]he special prosecutor may conclude that it is necessary to handle a criminal investigation which the special prosecutor has been assigned *in conjunction with other ongoing criminal investigations being handled by the Department of Justice.* Therefore, i[t] is particularly appropriate that the special prosecutor have the authority to ask the Attorney General or the

---

Cong., 1st Sess. at 69, 1978 U.S.C.C.A.N. at 4285. As the Act makes clear, the special prose-

cutor must consider these guidelines, but is not bound to follow them.

division of court to assign related matters to the special prosecutor.... [T]here will have to be coordination between the special prosecutor and the Attorney General to sort out the jurisdiction of the special prosecutor as it relates to the *ongoing investigations* of the Department of Justice. If these adjustments require the referral of related matters from the Department of Justice to a special prosecutor, there is no need to involve the division of the court other than to inform the division of the court that such an arrangement has been reached. The other side of this necessary cooperation will take place under subsection 597(a) which permits the special prosecutor to agree in writing that certain portions of the investigations assigned to him by the division of the court continue to be conducted by the Department of Justice.

S.REP. No. 170, 95th Cong., 1st Sess. at 69, 1978 U.S.C.C.A.N. at 4285 (emphasis added). Given such a contemplated rearrangement of jurisdiction, we cannot accept the notion that temporary uncertainties or even overlaps in the division of jurisdiction between the DOJ and the OIC automatically invalidate all investigations or prosecutions that were commenced before the distribution of jurisdiction is finally settled in writing.

The potential scope of the special prosecutor's initial jurisdiction in this case was vast, including investigation of "whether [former HUD Secretary] Pierce, ... other officials of the department, and *other individuals and entities,* may have committed, from 1984 through 1988 inclusive, the crime of conspiracy to defraud the United States or *any other federal crimes* relating to [the administration of several HUD programs]." *In re Samuel R. Pierce, Jr.* at 1–2 (D.C.Cir.Sp.Div. No. 89–5 July 1, 1990) (emphasis added). Accordingly, it is unsurprising that the determination whether any given individual's actions were within the special prosecutor's jurisdiction was no simple task. The only clear target of the investigation specified in the court order was Secretary Pierce himself. Evidently, the OIC believed that prior to the

USAO's request for an indictment, the Florida investigation into local corruption had not yet emerged as duplicative of the OIC's investigation so as to warrant the OIC's assertion of jurisdiction.

In addition to the simple fact that the OIC itself may not have anticipated precisely where DOJ's investigation of local corruption involving Briscoe would end up, the grand jury process leading up to the indictments also provided another source of uncertainty. Time and again, the Supreme Court has recognized that in grand jury proceedings, "the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning." *United States v. Dionisio,* 410 U.S. 1, 13 n. 12, 93 S.Ct. 764, 771 n. 12, 35 L.Ed.2d 67 (1973) (quoting *Hendricks v. United States,* 223 U.S. 178, 184, 32 S.Ct. 313, 316, 56 L.Ed. 394 (1912)). *See also Blair v. United States,* 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919); *In re Grand Jury Proceedings (U.S. Steel–Clairton Works),* 525 F.2d 151, 157 (3d Cir.1975) ("At that nascent stage of the grand jury's inquiry, the lower court could not possibly predict whether indictments would issue, or, if issued, against whom and for what violations."). Indeed, even after the OIC issued written permission to the DOJ to seek the indictments and after the grand jury returned the indictments, Briscoe contended (in his original opposition to consolidation) that the Florida and D.C. indictments did not arise out of the "same acts or transactions." Joint Appendix ("J.A.") 276, 278 n. 12.

In the face of such uncertainties, and given that the government prosecutors were at all times authorized by their respective superiors to conduct the grand jury proceedings at issue, that the special prosecutor exercises broad discretion to employ the resources and personnel of the DOJ,[2] and that the indictment itself was authorized in writing, the shift of jurisdiction from the Attorney General to the special prosecutor contemplated by § 597(a) does not create any fundamental defect that "goes to the very existence of the

---

**2.** Pursuant to § 594(d)(1), the special prosecutor may "use ... the [DOJ] resources and personnel

necessary to perform such independent counsel's duties."

grand jury itself," or to the indictment it produces. *United States v. Fein*, 504 F.2d 1170, 1173 (2d Cir.1974) (dismissing indictment because grand jury's authority had expired). Nothing in the language, structure, or purpose of the Ethics Act indicates that courts should strike down every indictment that originates in DOJ investigations commenced prior to formal approval by the OIC.

■ In other words, where prior to the appointment of a special prosecutor DOJ had authorized and commenced a grand jury investigation, a subsequent turn of events that results in the DOJ investigation encompassing matters within the jurisdiction of the special prosecutor does not in itself deprive the DOJ-run investigation up to that point of its validity *so long as* the special prosecutor promptly authorizes in writing the continuation of that investigation or its culmination in indictments. Certainly as in this case, where neither the OIC nor the DOJ complains of one another's trespass onto its "turf," and where the defendants can point to no injury from the simultaneity of the proceedings, we decline to penalize the OIC's initial decision that the Florida investigation was not sufficiently duplicative of its own, as to require at an earlier point formal, written authorization to proceed.

■ Appellants additionally charge that under the Act, the OIC was not empowered to authorize the USAO to obtain the Florida indictment, or to consolidate the Florida and D.C. indictments for joint prosecution by the OIC and the DOJ. To be sure, the principal aim of the independent counsel provisions is to guard the court-appointed prosecutor from undue influence by the Administration in general and the DOJ in particular. *See In re Sealed Case*, 829 F.2d at 56. Appellants are therefore accurate in asserting that it would subvert the purpose of the Act to permit the special prosecutor, once appointed, to hand the essential parts of his investigation back to the DOJ. But we have no such situation here; there has been no surrender of responsibility as to principal facets of the OIC investigation. The OIC's own subsequent investigation, indictments, and prosecution attest to that fact.[3] Short of significant abdication of responsibility for its investigative charge, the Act permits and indeed contemplates substantial cooperation between the OIC and the DOJ. The Act entrusts the OIC with making the decision as to just how high a wall of separation between it and the DOJ must be erected.

For example, the Ethics Act grants the OIC,

> full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice, the Attorney General, and any other officer or employee of the Department of Justice, except that the Attorney General shall exercise direction or control as to those matters that specifically require the Attorney General's personal action under section 2516 of title 18 [relating to wiretaps].

28 U.S.C. § 594(a). This grant of plenary power, however, nowhere requires that the OIC exercise that power *in complete isolation* from the DOJ. Indeed, as a lesser included power, the Act specifically contemplates that the OIC may "*participat[e] in court proceedings ... that such independent counsel considers necessary,*" and which presumably are being conducted by regular DOJ personnel. *Id.* at § 594(a)(2) (emphasis added). Moreover, §§ 594(d) and 597(a) expressly empower the OIC to "request assistance from the Department of Justice in carrying out the functions of the independent counsel." The statutory language does not place any substantive limit on the type of assistance rendered by the DOJ, but freely permits the OIC to "use ... the [DOJ] resources and personnel necessary to perform [its] duties." *Id.* at § 594(d)(1). Finally, the Act contemplates that the independent counsel may "consult[ ] with the United States attorney for the district in which any violation of law with respect to which the independent counsel is appointed was alleged to have oc-

---

**3.** Generally, of course, the Act does not charge this court with policing the quality of the independent prosecutor's investigative efforts. It is the Attorney General, and she alone who may remove the independent prosecutor "and only for good cause." 28 U.S.C. § 596(a)(1). *See also Morrison v. Olson*, 487 U.S. 654, 682, 108 S.Ct. 2597, 2614, 101 L.Ed.2d 569 (1988).

curred." *Id.* at § 594(a)(10). In sum, written permission for the USAO to seek the Florida indictment, subsequent consolidation with the D.C. indictment, and joint prosecution of both indictments by the OIC are prosecutorial strategies that the OIC has full authority to follow.

■ Of course where the DOJ is called upon to assist with matters within the OIC's jurisdiction, the OIC will retain ultimate control of tactical decisionmaking. For example, where the Attorney General sought a stay of prosecution in an OIC matter, our trial court ordered that "[o]nly [i]ndependent [c]ounsel will be recognized as responsible for the day-to-day conduct of this case in the United States District Court." *United States v. North,* 713 F.Supp. 1441, 1442 (D.D.C.1989). Similarly, in a case in which "the Department of Justice has been working in concert both with the national intelligence agencies and with independent counsel to ensure that national security secrets are safeguarded" and in which "the Attorney General has participated in framing both the initial charges and the substitution proposals," the Fourth Circuit found that the OIC nonetheless retained the exclusive power to appeal a trial court ruling on the admissibility of classified information. *United States v. Fernandez,* 887 F.2d 465, 467 (4th Cir.1989). In short, while the independent counsel remains firmly in the driver's seat of any investigation or prosecution within his court-designated jurisdiction, the Ethics Act in no way prohibits him from exercising his authority in cooperation with the DOJ as he has done here.

**B. Venue, Joinder and Prosecutorial Vindictiveness**

Appellants argue next that consolidation of the Florida and D.C. indictments violated their constitutional venue rights and that the third superseding indictment was motivated by prosecutorial vindictiveness directed at Briscoe for having successfully transferred the Florida prosecution to D.C. We do not credit either of these contentions.

**1. Venue**

■ The Constitution guarantees criminal defendants the right to be tried in the state and district in which the alleged crime was committed. U.S. CONST. Art. III, § 2, cl. 3 & amend. VI. It has long been settled in this circuit and elsewhere, however, that a defendant may waive his right to proper venue. *Jones v. Gasch,* 404 F.2d 1231, 1235 (D.C.Cir.1967), *cert. denied,* 390 U.S. 1029, 88 S.Ct. 1414, 20 L.Ed.2d 286 (1968). *See also Singer v. United States,* 380 U.S. 24, 35, 85 S.Ct. 783, 790, 13 L.Ed.2d 630 (1965) (dictum). Upon defendant Briscoe's own motion and in the notable absence of any objection by defendant Steier, the Florida case was transferred to the District of Columbia pursuant to FED.R.CRIM.P. 21(b). *United States v. Briscoe et al.,* No. 91–8066 (S.D.Fla. Jan. 30, 1992) (J.A. 189). As we observed in *Jones,* "[t]he constitutional rationale for these [transfer] procedures [including Rule 21(b) ] was the accused's waiver, by his motion for the transfer, of his right to trial where the offense allegedly occurred." 404 F.2d at 1235. *See also* 2 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 306, p. 221 (2d Ed.1982) ("Certainly a defendant has made a knowing waiver if he ... moves for transfer to an otherwise improper venue under Rule 21."). It seems to us beyond doubt that appellant Briscoe by initiating the move to transfer to D.C. waived any subsequent objections based on improper venue.

■ Of course, one defendant's motion cannot, by itself, work another defendant's knowing waiver of a privilege. *See United States v. Stratton,* 649 F.2d 1066, 1076–79 (5th Cir.1981). Rule 21(b) provides:

For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding *as to that defendant* or any one or more of the counts thereof to another district.

FED.R.CRIM.P. 21(b) (emphasis added). Since Steier did not formally join Briscoe's transfer motion, then, it was arguably error for the district court to transfer the proceeding as to *both* defendants from Florida to the District of Columbia. Here, however, "the particular facts and circumstances surrounding th[is] case, including the background, experience, and conduct of the accused" lead us

to conclude that Steier, too, waived his venue objections. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

Not only did the Florida district court note Steier's silence in its transfer order, but *after* Steier's case was transferred to D.C., Steier affirmatively represented to the D.C. trial court that he had no objections to the transfer. In his memorandum opposing consolidation of the Florida and D.C. indictments filed in June, 1992, Steier made clear that he objected to consolidation in the trial court *not* because venue in D.C. was improper, but because of the prejudice that consolidation would cause him at trial. *See* Memorandum in Support of Defendant Maurice David Steier's Opposition to Consolidation of Trials, *United States v. Briscoe et al.,* No. 91–399 at 18 (D.D.C. filed June 4, 1992). Steier explicitly proclaimed in that memorandum to the district court: "[i]t is important to note that Mr. Steier was fully prepared to go to trial in Florida as well as in the District of Columbia." *Id.* at 17–18. In other words, Steier on his own accord affirmatively represented to the trial court that he was ready and willing to stand trial in the District of Columbia.

While " 'courts indulge every reasonable presumption against waiver,' of fundamental constitutional rights," *Johnson,* 304 U.S. at 464, 58 S.Ct. at 1023 (quoting *Aetna Ins. Co. v. Kennedy,* 301 U.S. 389, 393, 57 S.Ct. 809, 812, 81 L.Ed. 1177 (1937)), we must conclude that both Briscoe and Steier waived their venue right in the course of the proceedings below. We consequently refuse to consider the merits of their claim that the Florida indictment "does not allege a sufficient nexus with the District of Columbia to establish venue."

### 2. *Prosecutorial Conduct in Obtaining the Third Superseding Indictment*

Briscoe and Steier argue that the OIC abused the grand jury process and was motivated by prosecutorial vindictiveness when it sought the third superseding indictment from the D.C. grand jury and subsequently moved for consolidation. They maintain that upon transfer of the DOJ's Florida indictment to the District of Columbia, that indictment could not have been joined with the OIC's then-pending second superseding indictment because while the former indicted Briscoe and Steier as co-conspirators, the latter did not. They contend that the OIC returned to the grand jury to obtain the third superseding indictment (which finally did indict Briscoe and Steier as co-conspirators) "[a]s a transparent stratagem to cure this problem," thereby abusing the grand jury process. Brief for Appellant Briscoe at 15. Finally, they charge that the third superseding indictment " 'up[ped] the ante' " in an illicit attempt to penalize Briscoe for lawfully exercising his right to transfer. *Id.* at 16 (quoting *Blackledge v. Perry,* 417 U.S. 21, 28, 94 S.Ct. 2098, 2102–03, 40 L.Ed.2d 628 (1974)). We disagree.

As an initial matter, defendants fail entirely to point to caselaw or other authority prohibiting a prosecutor from seeking a superseding indictment in order to cure procedural defects of the first one. More important, however, we agree with the trial court that "consolidation of the *second* superseding indictment [and the Florida indictment, once transferred to D.C.,] would have been appropriate." *United States v. Briscoe et al.,* 1992 WL 207943, *5 n. 9, No. 91–399 at 7 n. 9 (D.D.C. Aug. 14, 1992) (emphasis added).

According to Rule 13 of the Federal Rules of Criminal Procedure, "[t]he court may order two or more indictments ... to be tried together if the offenses, and the defendants if there is more than one, could have been joined in a single indictment." The joinder of multiple defendants in a single indictment is governed by the following rule:

> Two or more defendants may be charged in the same indictment ... if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

FED.R.CRIM.P. 8(b).[4] The First Circuit's pragmatic explanation of the benefits of joinder is particularly apt here:

> Classic examples of such a benefit are when there is an overlapping of issues, as for example, when some defendants are charged with transporting stolen goods in interstate commerce and others are charged with receiving the goods, so stolen and transported, or when defendants are charged with conspiracy to conceal a crime that part of their number are charged with committing. Where, however, there are no presumptive benefits from joint proof of facts relevant to all the acts or transactions, there is no "series," Rule 8(b) comes to an end, and joinder is impermissible.

*United States v. Jackson*, 562 F.2d 789, 794–95 (D.C.Cir.1977) (quoting *King v. United States*, 355 F.2d 700, 704 (1st Cir.1966)).

■ In determining whether joinder of multiple defendants in a single prosecution is proper, this circuit permits a trial court to consult the indictment as well as any other pretrial evidence offered by the government. *United States v. Halliman*, 923 F.2d 873, 883 (D.C.Cir.1991); *United States v. Perry*, 731 F.2d 985, 990 (D.C.Cir.1984) ("[A] demonstration of the necessary relationship [between joined offenses]—and hence the benefit to the court of joinder—may be made by the Government at *some time before trial.*" (emphasis in original)).[5] In this case, however, the indictment alone provides sufficient support to uphold a joinder of the DOJ indictment which originated in Florida and ei-ther the second superseding or the third superseding indictment.

■ Although Steier was not indicted in the second superseding indictment, he was an unindicted co-conspirator who was alleged to have set up the Northwest Investment Company and other corporations "that would be used to conceal the payment, receipt and expenditure of money given to DuBois Gilliam for his oversight of UDAG projects at HUD." *United States v. Wilson et al.*, No. 91–0399 at ¶ 35 (D.D.C. Jan. 14, 1992) (second superseding indictment). *See also id.* at ¶¶ 19, 21 & 27. The second superseding indictment alleged that Steier would receive payments from Leonard Briscoe for DuBois Gilliam "in the guise of payments for legal work purportedly performed by ... Steier," *id.* at ¶ 36, and it alleged numerous specific acts committed by Steier in furtherance of the described scheme, *id.* at ¶¶ 47, 51, 52, 54 & 60. The main purpose of the conspiracy alleged in the second superseding indictment was to secure UDAG funds for Briscoe's projects by illegal means. *Id.* at ¶ 28. The Florida indictment which had been obtained earlier by the DOJ, of course alleged virtually the identical purpose when describing the conspiracy among Briscoe and Steier and alleging specific offenses for which they were being indicted. *United States v. Briscoe et al.*, No. 91–8066 (S.D.Fla. Jul. 12, 1991) (J.A. 109). Therefore, after the Florida indictment was transferred to the District of Columbia it could well have been consolidated with the second superseding indictment,

---

4. Rule 8(b) governs joinder of multiple defendants. Rule 8(a), on the other hand, sets forth the requirements for joinder of multiple offenses:

> Two or more offenses may be charged in the same indictment ... in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

While Rules 8(a) *and* 8(b) might be thought to apply in cases where multiple defendants *and* multiple offenses are involved, we have repeatedly refused to concede that Rule 8(a) has any application when the issue concerns the proper joinder of multiple defendants. In cases involving multiple defendants, "the weight of authority in this circuit and elsewhere regards Rule 8(b) as providing the sole standard for determining the permissibility of joinder of offenses." *United States v. Jackson*, 562 F.2d 789, 793 (D.C.Cir. 1977). *See also United States v. Halliman*, 923 F.2d 873, 883 (D.C.Cir.1991); *United States v. Perry*, 731 F.2d 985, 989 (D.C.Cir.1984).

5. Other circuits have required the government to demonstrate the propriety of joinder on the face of the indictment, *i.e.*, without recourse to other pretrial evidence extraneous to the indictment. *See United States v. Kaufman*, 858 F.2d 994, 1003 (5th Cir.1988); *United States v. Grey Bear*, 863 F.2d 572, 576 (8th Cir.1988) (en banc) (per curiam) (equally divided court), *cert. denied*, 493 U.S. 1047, 110 S.Ct. 846, 107 L.Ed.2d 840 (1990); *United States v. Bledsoe*, 674 F.2d 647, 655 (8th Cir.), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982); *United States v. Morales*, 868 F.2d 1562, 1567 (11th Cir.1989).

since the two alleged " 'acts ... [that were] connected together or constitute[ed] parts of a common scheme or plan.' " *Perry,* 731 F.2d at 990 (quoting *Jackson,* 562 F.2d at 796 (citation omitted)). *Cf. id.* ("there must be a logical relationship between the acts"). In other words, the OIC would not have had to return to the grand jury after the Florida indictment was transferred to D.C. in order to secure consolidation. It could have joined the DOJ and the OIC prosecutions on the basis of the then-existing second superseding indictment.

If consolidation of the Florida indictment with the second superseding indictment would have been proper, *a fortiori* consolidation with the third superseding indictment can be upheld. Since the third superseding indictment is no narrower in scope or less specific in allegation of individual acts than the second superseding indictment, we must agree with the trial court that consolidation of the third superseding indictment with the Florida indictment was proper. *See United States v. Briscoe et al.,* No. 91–399 (D.D.C. May 19, 1992) (third superseding indictment).

■ Finally, appellants' charges that the third superseding indictment was motivated by prosecutorial vindictiveness in retaliation for the defendants' having exercised their lawful right to transfer to D.C. are wholly unfounded. In its memorandum in support of consolidation, the OIC informed the court of its intention, if the Florida indictment were consolidated with the third superseding indictment, to move at the appropriate time to dismiss the Florida conspiracy count so that only one conspiracy count against Briscoe and Steier would go to the jury. J.A. 268–69. That is precisely what happened at trial. In sum, because the OIC had no reason to penalize the exercise of the defendants' right to transfer and indeed took the initiative to ensure that Briscoe and Steier could only be convicted on one conspiracy count, we find a distinct absence of any "realistic likelihood of 'vindictiveness' " involved in the prosecution of this case. *Blackledge v. Perry,* 417 U.S. 21, 27, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628 (1974).

C. *Wilson's Waiver of the Statute of Limitations*

Lance H. Wilson was convicted on the final count in the third superseding indictment, which charged that "[o]n or about September 20, 1986," Wilson provided illegal gratuities to "DuBois Gilliam, for and because of official acts performed and to be performed by said public official ... concerning applications for Urban Development Action Grants" in violation of 18 U.S.C. § 201(c)(1)(A). *United States v. Briscoe et al.,* No. 91–399 at 54 (count 30) (D.D.C. May 19, 1992). Wilson did not deny at trial that he paid for Gilliam and his wife to spend a weekend in New York on the date mentioned. However, the first indictment charging Wilson with this offense was returned on January 14, 1992, more than five years after September 20, 1986. *See United States v. Wilson et al.,* No. 91–0399 at 51 (count 24) (D.D.C. Jan. 14, 1992). The government readily admits that this count would be time barred in the absence of Wilson's waiver of the applicable statute of limitations which provides:

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found ... within five years next after such offense shall have been committed.

18 U.S.C. § 3282. As the Supreme Court explained in *Toussie v. United States,* 397 U.S. 112, 114–15, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970):

> The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity.

*See also* WAYNE R. LaFAVE & JEROLD H. ISRAEL, 2 CRIMINAL PROCEDURE § 18.5(a), pp.

423–24 (1984) (quoting *Toussie* and noting other purposes of time bar).

The government locates Wilson's waiver of the time bar in a series of letters written by his attorneys on his behalf to the OIC. Although Wilson does not deny that the letters were written on his behalf, he argues that their content and the circumstances surrounding their issuance do not permit an inference of waiver. He contends that the letters waive the statute of limitations only for specified events which do not include the alleged September 20th gratuity, that he never signed the letters himself, and that he never discussed with his attorneys waiving the time bar with respect to the September 20th New York trip and "certainly had not authorized them to do so." Brief for Appellant Wilson at 18.

Prior to trial, Wilson moved for dismissal of the gratuity count on time bar grounds and, after denial of his initial motion, unsuccessfully sought reconsideration. The trial court accepted the fact that Wilson had never discussed with his attorneys waiving the statute of limitations as to the gratuity count. Nonetheless, the trial court likened a waiver to a contract and, in examining the objective manifestations of the parties' intent, found sufficient evidence that the "broad waivers of the statute of limitations executed by counsel for defendant Wilson amounted to a knowing and intelligent waiver of the statute of limitations encompassed in [the gratuity count] of the indictment." J.A. 366–67. Wilson objects not only to the trial court's legal analysis of waiver of a statutory right in terms of ordinary contract principles but argues in addition that even if the letters are viewed as the objective manifestations of Wilson's intent, they evince an exclusion rather than inclusion of the gratuity count from the scope of his intended waivers.

▉▉▉▉▉ Since *United States v. Wild,* 551 F.2d 418 (D.C.Cir.1977), *cert. denied,* 431 U.S. 916, 97 S.Ct. 2178, 53 L.Ed.2d 226

(1977), the settled law in our circuit has been that a criminal statute of limitations is not jurisdictional in nature and therefore can be waived. In *Wild,* we held that the statute of limitations had been waived "where ... the defendant followed the advice of competent counsel and executed an express written waiver prior to the expiration of the statute of limitations." 551 F.2d at 419. We reasoned in that case:

> [I]f a defendant may waive certain constitutional rights, he should certainly be capable in this instance of waiving a statutory right such as the statute of limitations.[6] ... If the strong policies behind these [constitutional] rights are not violated by a rule permitting them to be waived by a defendant, we cannot find that the limitation statute's policy is violated here where the *defendant was fully cognizant of the consequences of such a waiver and decided to execute it on the advice of his attorney for his own benefit.*

*Wild,* 551 F.2d at 424–25 (emphasis added). While in *Wild* we contemplated that an "implicit agreement" may in certain circumstances be sufficient to waive the time bar, 551 F.2d at 423, we had no occasion to probe the necessary requirements of implied waivers since the waiver there had been made expressly. Nonetheless the reasoning of that decision ultimately rested on the fact that the defendant had waived the time bar voluntarily, intelligently, and knowingly so that the purposes of the time bar were fully preserved.[7] *Cf. United States v. Levine,* 658 F.2d 113, 120–21 (3d Cir.1981) ("It is also possible for a defendant knowingly and intelligently to waive the statute of limitations, thus sanctioning a later indictment which, absent such a waiver, would be untimely."); *id.* at 124 n. 17 ("Because waivers of limitations statutes, similar to guilty pleas, involve the relinquishment of important rights, it has been held that they should also be made with the advice of counsel and informed by an understanding of the consequences of waiv-

---

**6.** The statute of limitations which is concerned with pre-indictment delay does not ordinarily rise to the level of a constitutional speedy trial right under the Sixth Amendment. *See United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *Wild,* 551 F.2d at 423.

**7.** Since the alleged waiver in this case is not an open-ended one, we need not be concerned with questions of whether the defendant was "prosecuted within a reasonable length of time" or has sustained "prejudice resulting from the [untoward] delay." *Wild,* 551 F.2d at 425.

er."); *United States v. Heidecke,* 900 F.2d 1155 (7th Cir.1990) (finding waiver to have been made knowingly and voluntarily); *United States v. Meeker,* 701 F.2d 685 (7th Cir.), *cert. denied,* 464 U.S. 826, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983) ("The purposes of a time bar are not offended by a knowing and voluntary waiver of the defense by the defendant." (footnote omitted)); *United States v. Caldwell,* 859 F.2d 805, 806 (9th Cir.1988), *cert. denied,* 489 U.S. 1039, 109 S.Ct. 1173, 103 L.Ed.2d 235 (1989) ("Thus, unless other lines of caselaw or public policy concerns compel a different result, the standard for acceptance of a waiver of the statute of limitations should be the same as the standard in other waiver contexts, *i.e.,* whether the waiver was knowing and voluntary." (citing *Wild,* 551 F.2d at 424–25)).

Inquiring, then, whether Wilson's waiver was made knowingly, voluntarily, and intelligently, we turn first to the letters written on Wilson's behalf by his attorneys to the OIC. Only if these clearly encompass a waiver of the September 20th gratuity, need we ask further whether the letters can support a finding of waiver despite the fact that Wilson never signed the letters and that, as the trial court readily accepted, his attorneys had never spoken to Wilson specifically about waiving the September 20th gratuity.[8]

The OIC first contacted Wilson on July 9, 1991, in connection with "activities involving the Wedgewood Plaza Mall UDAG" for which the "statute might run on July 15, 1991." J.A. 153. Apparently July 15, 1991, would have marked the fifth anniversary of Wilson's filing of the firm commitment letter for the Wedgewood Plaza Mall UDAG with HUD, and it was solely in this context that Wilson's attorneys discussed the waiver with the defendant. Since the government did not obtain a waiver from Wilson personally, Wilson's counsel replied on July 11, 1991, that Wilson

> agree[d] that the statute [of limitations] will be tolled for a 90–day period commencing on July 14, 1991 and ending on October 15, 1991. That period of time will be excluded from the calculation of any limitations period within which any charges concerning this [Wedgewood Plaza Mall] UDAG may be filed.[9]

J.A. 155. While this was the most broadly-worded concession in any of the cited letters, the 90–day period it covers actually expired before the January 14, 1992 indictment of Wilson on the gratuity charges.[10]

On September 23, 1991, the OIC wrote to Wilson requesting an extension of the waiver. The reply letter by Wilson's attorneys noted that Wilson would waive the statute of limitations "for an additional 60–day period" only "with respect to the July 15, 1986 *commitment letter* for the Wedgewood Plaza Mall UDAG ... [and] charges *directly involving* that matter." J.A. 165 (emphasis added).

On October 31, 1991, shortly before the fifth anniversary of the commitment letter Wilson submitted for the Overton Ridge project, the OIC requested Wilson to waive the statute of limitations "on the Overton Ridge Project as he has for the earlier indictment." J.A. 171. Again, counsel for Wilson discussed waiver with him solely with respect to the commitment letter, and Wilson submitted

---

**8.** The OIC, for example, likens a waiver of the limitation ban to an individual's consent to a car search where the "standard for measuring the scope of a suspect's consent ... is that of 'objective' reasonableness." *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). In so doing, the OIC overlooks the Supreme Court's admonition that "[t]here is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures." *Schneckloth v. Bustamonte,* 412 U.S. 218, 241, 93 S.Ct. 2041, 2055, 36 L.Ed.2d 854 (1973).

**9.** The letter makes clear, "[h]owever, [that] the statute of limitations will not be waived with regard to any other offenses as to which the statute would be a bar as of July 14, 1991." J.A. 155. All subsequent letters contain identically phrased limitations of the waiver. *See* J.A. 165 & 173.

**10.** Even if the statute of limitations for the September 20th gratuity was tolled for 90 days by this waiver, time for prosecuting the offense would have expired on December 19, 1991, *i.e.,* five years plus 90 days after September 20, 1991.

a waiver tolling the statute for a 60–day period "with respect to the issuance of the November 25, 1986 *commitment letter* for the Overton Ridge Development UDAG ... [and] charges *directly involving* that matter." J.A. 173 (emphasis added).

Finally, on November 21, 1991, the OIC requested that Wilson synchronize the statutory periods of the executed waivers, Wilson's attorneys once again discussed the matter with him exclusively in terms of the commitment letters, and the attorneys wrote to the OIC on December 4, 1991, that Wilson would waive the statute "with respect to the issuance of the July 15, 1986 *commitment letter* for Wedgewood Mall ... [and] any charges *directly involving* the Wedgewood Mall commitment letter." J.A. 177 (emphasis added). None of the requests for a waiver and none of the waivers made reference to any acts on September 20, 1986, the date on which Wilson was found to have provided the illegal gratuity.

1. *The Trial Court's Failure to Present to the Jury the Issue of the Relationship Between the Gratuity and the Commitment Letters*

Even assuming that the time bar for a gratuity that "directly involv[ed]" the Overton Ridge or the Wedgewood Plaza Mall commitment letters was validly waived by the written concessions, the illegal gratuity represented by the New York trip would not necessarily fall within the scope of that waiver. According to the government's evidence at trial, Gilliam ordered his staff to fund the Wedgewood Plaza *Apartments* (as opposed to the Mall) in December, 1985. In subsequent conversations and meetings around March and April, 1986, Gilliam and Briscoe allegedly agreed to cooperate and secure UDAGs for future projects, beginning with the Wedgewood Plaza *Mall.* In late April, Wilson allegedly invited Gilliam to New York and the trip was consummated on September 20, 1986, shortly after Gilliam had accepted a firm financial commitment letter leading to the funding of the Mall project that August. According to the government, after the New York trip, Briscoe sought funding for the Overton Ridge project, Gilliam again accepted a false firm commitment letter from Wilson, but funding for the project never materialized and the project eventually died.

While it is, of course, always *possible* that the September 20th gratuity was meant to reward Gilliam for the Wedgewood Plaza Mall and Overton Ridge UDAGs, it could just as well have been provided exclusively in connection with the Wedgewood Plaza *Apartments* or other official duties not involving the acceptance of the firm financial commitment letters. In short, the government was never required to prove at trial that the illegal gratuity directly involved the two commitment letters which are specifically addressed in the written waivers executed by Wilson's attorneys. Thus, were we like the trial judge to rely entirely upon the language of the letters in order to determine the scope of the intended waiver (and disregard the fact that Wilson never spoke to his attorneys about waiving anything beyond the submission of the firm commitment letters themselves), we would still be compelled to find that the commitment letters described as the subject of the waiver might have but need not have "directly involv[ed]" the illegal gratuity on September 20, 1991—that nexus if it existed was one which had to be established by evidence extraneous to the letters.

When prosecution of a defendant proceeds on one theory of the case, but would be time barred on any other, the jury may be presented with two options: either find the defendant guilty on the theory permitting prosecution, or acquit the defendant. *See Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). *Grunewald* involved convictions for a conspiracy to obtain "no prosecution" rulings from the Internal Revenue Service in order to shield certain taxpayers from tax liability. The Court held that it was "incumbent on the [g]overnment to prove that the conspiracy ... was still in existence [during the limitations period] and that at least one overt act in furtherance of the conspiracy was performed [during that time]." *Id.* at 396, 77 S.Ct. at 970. Since the "no prosecution" rulings had all been obtained outside the limitations period, petitioners contended that the prosecution was barred by the statute of limitations. The government, however, argued that the con-

victions could be sustained on the theory that the conspiracy was really one of shielding taxpayers from any liability, including criminal tax prosecution which could have been brought for several years *after* obtaining the "no prosecution" rulings.[11] On this view, the conspiracy continued until the threat of prosecution for tax evasion had passed, thereby extending criminal activity well into the limitations period. The Court agreed that on this theory the conspiracy would not have been barred by the statute of limitations and that the evidence in the case indeed would have permitted the jury to "infer ... that the conspirators were prepared and had agreed to engage in further frauds and bribery if necessary in order to maintain in effect the tentative rulings obtained [outside the limitations period]" until the threat of prosecution subsided. *Id.* at 410, 77 S.Ct. at 977. But this theory was not properly charged and nothing indicated that the jury found this extended conspiracy to have taken place. The instructions would equally have permitted the jury to convict solely based on the more limited, time-barred conspiracy to obtain the "no prosecution" rulings. The Court concluded that "[s]ince, under the judge's charge, the convictions ... might have rested on an impermissible ground ... they cannot stand." *Id.* at 415, 77 S.Ct. at 979.

Similarly, the Eleventh Circuit held that a trial court could not refuse to charge the jury with determining that the offense was committed during the limitations period. *United States v. Edwards,* 968 F.2d 1148 (11th Cir. 1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1006, 122 L.Ed.2d 155 (1993). "[O]nce ... conflicting evidence [is] presented [on the limitations issue,] the question of whether the [g]overnment instituted the prosecution ... in a timely manner bec[omes] an issue for the jury to determine." *Id.* at 1153. At that point, the jury must be "properly instructed [to] determine whether the ... offense occurred [outside of the limitations period]." *Id. See also United States v. Alfonso–Perez,* 535 F.2d 1362 (2d Cir.1976); *cf. United States v. Perholtz,* 842 F.2d 343, 364–65 (D.C.Cir.), *cert. denied,* 488 U.S. 821, 109

S.Ct. 65, 102 L.Ed.2d 42 (1988) (jury was properly charged to find that defendants caused the mailing of documents authorizing the payment of funds in connection with the illegal scheme; "Since the mailings that clearly furthered the scheme to defraud occurred within five years of the date of the indictment, the mail fraud prosecution is not time barred." *Id.* at 365.). Since the jury that convicted Wilson was never made aware of the requirement that the illegal gratuity be connected to the Wedgewood Plaza Mall or the Overton Ridge commitment letters in order to fall within the time bar, we have no way of knowing whether it convicted Wilson for a gratuity that was time barred or for the one that was arguably within the scope of his waiver. *Cf. Allred v. United States,* 146 F.2d 193, 195 (9th Cir.1944) (unnecessary to show that the crime was committed on exact date mentioned in indictment, where "[t]he evidence showed ... that the crime was committed (if committed at all) within [the limitations period].").

### 2. *Wilson's Failure to Request a Proper Jury Instruction*

 Ordinarily where a case goes forward on a theory which places the offense within the limitations period, it is incumbent upon the defendant at the close of the trial to request a jury instruction requiring that his guilt be determined solely in terms of conduct not barred by the applicable statute of limitations. *See, e.g., Alfonso–Perez,* 535 F.2d at 1364 (requesting instruction); *see generally* FED.R.CRIM.P. 30 ("No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection."); *United States v. Tarantino,* 846 F.2d 1384, 1401 (D.C.Cir.), *cert. denied,* 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988) (reviewing jury instructions to which defendant failed to object only for plain error). Accordingly, in cases where the defendant failed to request a jury instruction limit-

---

**11.** Because of the governing six year statute of limitations on tax prosecution cases, the potential for prosecution of the original tax evasion would cease after six years of evasion. 353 U.S. at 406 & n. 19, 77 S.Ct. at 975 & n. 19.

ed to the theory on which prosecution of the offense was not time barred, courts have declined to consider challenges to the jury charge on appeal. *See United States v. Walsh,* 928 F.2d 7, 12 (1st Cir.1991); *United States v. Cianchetti,* 315 F.2d 584, 589 (2d Cir.1963). Nonetheless, we believe in the instant situation that the unconditional and final nature of the district court's pretrial ruling relieved Wilson of any obligation to reiterate his limitations concerns at the time when the jury was instructed.

 Under FED.R.CRIM.P. 12 defenses which are "capable of determination without the trial of the general issue may be raised before trial by motion." *Id.* at 12(b). Pretrial motions, such as a motion to dismiss a prosecution as time barred, "shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue." *Id.* at 12(e). "[G]ood cause" exists, and indeed a decision on a motion should be deferred, if disposing of the motion involves deciding issues of fact that are inevitably bound up with evidence about the alleged offense itself. "If a pretrial claim is 'substantially founded upon and intertwined with' evidence concerning the alleged offense, the motion falls within the province of the ultimate finder of fact and must be deferred." *United States v. Shortt Accountancy Corp.,* 785 F.2d 1448, 1452 (9th Cir.) (quoting *United States v. Williams,* 644 F.2d 950, 952–53 (2d Cir.1981)), *cert. denied,* 478 U.S. 1007, 106 S.Ct. 3301, 92 L.Ed.2d 715 (1986). *See also* 1 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 193, p. 708 (2D ED.1982) ("If [the statute of limitations defense] is raised by motion to dismiss, the court has discretion . . . when to determine it. . . . If . . . factual matters are involved, such as when a conspiracy ended or when an offense was consummated, the limitations question should be put off until the trial."); *id.* at § 194; *United States v. Stone,* 444 F.Supp. 1254, 1256 (E.D.Wis.), *aff'd,* 588 F.2d 834 (7th Cir.1978) (affirmative defense of withdrawal from the charged conspiracy outside the limitations period could not be determined pretrial because the government might succeed in proving at trial that the defendant committed an overt act in furtherance of the conspiracy within the limitations period).

In the case at hand, the issue of whether the gratuity was directly related to the acceptance of the two commitment letters for which the time bar had been waived was just such a fact inextricably interwoven with the evidence about the commission of the offense itself. To be sure, Wilson's motion to dismiss concentrated on the challenge that since he had never discussed waiving the time bar with respect to anything other than the submission of the commitment letters themselves, the waiver could not be construed to extend to *anything* beyond the two commitment letters that were discussed in his written relinquishment of the time bar. But the government's response focussed on how to interpret the scope of the written waivers assuming the fact that they might constitute a broader concession than the specific discussions between Wilson and his attorneys may have suggested. The government argued in response to Wilson's motion to dismiss the indictment that *"[t]he evidence at trial will show* that the only reason Mr. Wilson provided a gratuity to . . . Gilliam was to insure the latter's assistance in shepherding through HUD the PaineWebber commitment letters Gilliam knew to be fraudulent." J.A. 325 (emphasis added). Reading, as we think it reasonable to do, the government's reference to the "commitment letters" as relating exclusively to the two commitment letters that were the subject of Wilson's waiver, the trial court was alerted to the evidentiary nexus which still had to be proved at trial. As a result, the court should properly have deferred final judgment on the motion to dismiss until after trial when all the evidence concerning the relationship between the gratuity and the commitment letters had been introduced. The trial court, in other words, should have declined to dismiss the indictment before trial and permit the government to prove at trial that the gratuity was truly related to the relevant commitment letters while at the same time making it clear that the government was required to make that connection. Had the trial court done so, the defendant, of course, would have had to renew his objection at trial and request that the jury be charged with determining wheth-

er the government had borne its burden of proof in establishing the connection between the gratuity and the Overton Ridge and Wedgewood Plaza Mall commitment letters.

Here, however, the trial judge's pretrial ruling on the motion to dismiss was a definitive and sweeping one which rendered futile any later attempts by the defendant to resurrect the time bar objection. The pretrial ruling totally absolved the government of its burden at trial of having to demonstrate any connection between the gratuity and the two non-time-barred commitment letters. In the original order, the court tersely held "that the waivers of the statute of limitations executed by defendant Wilson *encompassed the conduct alleged* in Count 30 [the illegal gratuity count] of the indictment. Therefore, defendant Wilson's knowing and intelligent waiver of the statute of limitations encompassed that count as well as the others." J.A. 334 (emphasis added). Count 30 of the indictment, however, indicted Wilson for having provided an illegal gratuity "[o]n or about September 20, 1986, ... to ... Gilliam, for and because of official acts performed and to be performed by said public official ... concerning applications for [UDAGs]." *United States v. Briscoe et al.,* No. 91–399 at 54 (count 30) (D.D.C. May 19, 1992).

█ The court, in effect, construed the waiver as encompassing no limitation at all on the relationship between the gratuity for which Wilson could be convicted under count 30 and any particular commitment letters. There was no discussion in his opinion of evidence or theories which the government expected to prove at trial, or any suggestion that the government would need to muster particularized evidentiary support at trial in support of the determination that the gratuity fell within the scope of the waiver. When the court affirmed its original order on reconsideration, the reasoning was equally categorical. With no hint of any *factual* link *vel non* between the commitment letters referenced in Wilson's written waiver and the gratuity, the court unequivocally reiterated:

[T]he waivers drafted by defendant Wilson's counsel [are] *sufficiently broad and sweeping to encompass that conduct [i.e.,* the gratuity charge].... [T]he Court

finds that the broad waivers of the statute of limitations executed by counsel for defendant Wilson amounted to a *knowing and intelligent waiver of the statute of limitations encompassed in Count 30* [the gratuity count] of the indictment. J.A. 366–67 (emphasis added). In other words, the court unconditionally held that the waiver encompassed any illegal gratuity that would fall under count 30 of the indictment, and the trial court's decision was in no manner contingent upon factual support to be adduced by the government at trial showing a nexus with particular commitment letters or a subsequent jury finding to that effect. This reading of the waiver letters was obviously overly broad.

We believe that under these circumstances, where the trial court had explicitly and definitively settled the scope of the waiver issue prior to trial, thereby excluding it wholesale from the trial process, it would have been senseless for the defendant to argue at the close of the trial that the relation between the gratuity and the commitment letters was an undecided matter of fact to be presented to the jury.

█ To sum up, the district court at most was entitled to decide pretrial that the illegal gratuity prosecution could proceed *insofar* as it directly involved the Wedgewood Plaza Mall and Overton Ridge commitment letters. However, by deciding prior to trial that Wilson had waived the statute of limitations with respect to the gratuity count in its entirety, the trial judge effectively exempted the government from demonstrating at trial and the jury from deciding that the gratuity truly related to the letters referenced in the written waivers. The jury, then, may well have decided that the New York trip constituted an illegal gratuity but that it did not directly involve either the Wedgewood Plaza Mall or the Overton Ridge commitment letters and instead represented an unlawful reward for the Wedgewood Plaza Apartment funding or the performance of some other official act. As a result, even assuming that Wilson's attorneys validly waived the statute of limitations for Wilson with respect to the commitment letters and any charges directly involving the letters, we have no way of knowing

whether the jury convicted Wilson for a gratuity that directly involved these letters or a time-barred gratuity that did not directly relate to these letters. Because, then, the jury may have convicted Wilson on an impermissible ground, the conviction cannot stand.

## D. *Remaining Challenges*

We have carefully reviewed the remainder of appellants' challenges and find them meritless; we see no need to discuss them in detail here. We note, however, that contrary to the OIC's assertion, Steier did raise an objection to instructing the jury on the lesser included illegal gratuity charge along with the greater offense of bribery. *See* J.A. 1589. Nonetheless, we have no difficulty finding on the facts of this case that all the elements "for the ... prosecution ... to be entitled to a lesser included offense charge" over defendant's objection were satisfied, including the requirement that the jury could "consistently [have found] the defendant innocent of the greater and guilty of the lesser included offense." *United States v. Brewster*, 506 F.2d 62, 70–71 (D.C.Cir.1974) (quoting *United States v. Whitaker*, 447 F.2d 314, 317 (D.C.Cir.1971)). *See also United States v. Harary*, 457 F.2d 471, 478 (2d Cir.1972). The jury, for example could consistently have found (and in this case did find) that Steier provided gratuities "otherwise than as provided by law for the proper discharge of official duty" in violation of 18 U.S.C. § 201(c)(1), but without the requisite "corrupt[ ]" intent which would constitute bribery under 18 U.S.C. § 201(b)(1).

██ On the basis of applicable law and the facts of this case, we also find no reason to overturn the district court's denial of bills of particular to Steier and Briscoe, its refusal to grant Steier's severance motion, or its denial of Briscoe's special verdict form. Furthermore, the trial court did not err in applying the sentencing guidelines to Briscoe's conviction because the trial court could have found on the preponderance of the evidence that the gratuity involved payments after November 1, 1987. *See United States v.*

*Dale*, 991 F.2d 819, 853–54 (D.C.Cir.1993) (sentencing guidelines apply to offenses that begin before November 1, 1987, and continue after that date; and trial court may find, on the preponderance of the evidence, that conspiracy continued after November 1, 1987, notwithstanding that jury's general verdict form did not so specify). Finally, the trial court's evidentiary rulings and its occasional curtailment of cross-examination reveal no abuse of discretion warranting reversal. A somewhat more troublesome challenge involves the objected-to admission of Secretary Pierce's statement that Briscoe was "greedy" and a "crook"; that hearsay statement was clearly prejudicial and was only marginally relevant to the asserted purpose of showing that Pierce was not—as defendants maintained—approving UDAG funding for Briscoe on affirmative action grounds. In light of the weight of the remaining evidence presented in the course of the three-month trial, however, we find the error ultimately harmless. *See Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *United States v. Baker*, 693 F.2d 183, 189 (D.C.Cir.1982).

## III. CONCLUSION

For reasons set forth, we reverse Wilson's conviction and affirm the convictions of Briscoe and Steier.[12]

*It is so ordered.*

---

12. We deny appellant Briscoe's and appellant Wilson's motions to strike portions of the government's brief in light of our disposition of this case which did not require consideration of the disputed material.