# United States Court of Appeals
## For the First Circuit

No. 10-2247

UNITED STATES,

Appellee,

v.

JOSÉ FRANCO-SANTIAGO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Selya, Circuit Judges.

Irma R. Valldejuli for appellant.
José A. Contreras, Assistant United States Attorney, with whom
Rosa Emilia Rodríguez-Velez, United States Attorney, Nelson Pérez-
Sosa, Assistant United States Attorney, and Julia M. Meconiates,
Assistant United States Attorney, were on brief, for appellee.

May 31, 2012

**LYNCH, Chief Judge**.  José Franco-Santiago appeals from his federal criminal conviction on April 16, 2010, for being a member of an ongoing conspiracy which engaged in five robberies of businesses in violation of the Hobbs Act from July 2002 through September 2002.  He was a police officer with the Puerto Rico police force from 1991 until September 2007, shortly after he was indicted on August 22, 2007, on the conspiracy charge.

At his trial, the government put on evidence sufficient to prove that Franco-Santiago participated in one of the robberies.  On August 7, 2002, he assisted in the robbery of a private security firm's payroll by loaning the robbers his personal firearm and by driving a getaway car.  For his part in this robbery, he received $7,500.

Franco-Santiago makes several arguments on appeal, but there is one central argument: he contends that even if there was sufficient evidence to convict him of conspiring to commit the payroll robbery of August 7, 2002, there was not legally sufficient evidence to convict him of participating in the charged broader multiple-robbery conspiracy, much less one that included the next and final robbery of September 25, 2002.  As such, he argues, his conviction for the August 7, 2002, robbery was barred by the five-year statute of limitations for non-capital federal crimes.  See 18 U.S.C. § 3282(a).  In short, the government was two weeks too late in indicting him on August 22, 2007, for an August 7, 2002,

-2-

robbery.  We agree, reverse, and remand for entry of a judgment of acquittal.

I.

On August 22, 2007, a federal grand jury returned an indictment charging Franco-Santiago and seven co-defendants with one count of conspiring to rob businesses engaged in interstate commerce in violation of the Hobbs Act, 18 U.S.C. § 1951(a).[1]  The grand jury returned the second superseding indictment under which Franco-Santiago was tried on November 28, 2007.[2]  Both the original indictment and the second superseding indictment charged a conspiracy "[f]rom on or about the [sic] July 2002 up to on or about September 2002" and five overt acts: the robbery of a video store on July 2, 2002; the robbery of a supermarket on July 9, 2002; the robbery of a beauty salon sometime in July 2002; the robbery of a private security firm's payroll on August 7, 2002; and the robbery of a restaurant on September 25, 2002.

Five of Franco-Santiago's co-defendants pled guilty, one co-defendant's charge was dismissed with prejudice as time barred, and the charges of two others were dismissed without prejudice because they were fugitives.  Franco-Santiago alone went to trial.

---

[1]  The indictment also contained a second count that did not name Franco-Santiago.

[2]  The second superseding indictment added a ninth defendant.

-3-

His eight-day jury trial lasted from April 5, 2010, through April 15, 2010. On April 16, 2010, the jury returned a guilty verdict.

During his two-day sentencing hearing held in September 2010, the government conceded that there was no evidence presented at trial that Franco-Santiago knew about the three robberies committed in July 2002 and so he could not be held accountable for those robberies for purposes of calculating his guidelines sentencing range. However, on the first day of the hearing the government argued that Franco-Santiago's sentencing calculation should include the restaurant robbery of September 25, 2002. Franco-Santiago strenuously opposed this on the ground that there was no evidence presented at trial supporting an inference that he knew about or foresaw this robbery.

On the second day of the sentencing hearing, counsel for the government opened by telling the district court that he had "found some evidence that helps [the] defense and supports his argument that the defendant should not be held accountable for the September 25th robbery. Actually, to be bluntly honest, it appears that he should not be." The court stated that it had reached the same conclusion.

The court then based its sentencing calculation solely on Franco-Santiago's involvement in the August 7 payroll robbery. On September 28, 2010, the district court sentenced Franco-Santiago to ninety-six months in prison and three years of supervised release

and imposed a restitution order of $46,000, to be paid jointly and severally by the co-defendants who took part in the August 7 payroll robbery.  The court entered judgment the same day, and Franco-Santiago timely appealed.

On appeal Franco-Santiago raises multiple arguments, of which one is dispositive: that the government presented insufficient evidence that he was part of a single overarching conspiracy to commit robberies from July 2002 through September 2002, and at most he could only have been convicted of conspiring to commit the single payroll robbery of August 7, 2002, for which the statute of limitations had expired when he was first indicted on August 22, 2007.[3]

We hold that while there was sufficient evidence to convict Franco-Santiago of conspiring to commit the August 7 payroll robbery, there was insufficient evidence to convict him of agreeing to participate in a broader conspiracy spanning July 2002 through September 2002.  This has resulted in prejudice, not because of a variance, but because of the expiration of the statute

_____

[3]  Franco-Santiago's remaining arguments are: his right to a public trial was violated when his wife was purportedly prevented from being in the courtroom for jury selection; the district court committed reversible error when during the course of the trial it instructed the jury that a witness's Fifth Amendment right not to testify about past crimes was the same right that the defendant had not to testify in his own trial; the prosecutor impermissibly vouched for a witness's credibility during the closing argument; and the district court erred in determining that Franco-Santiago was jointly and severally liable for the full $46,000 in restitution.  We have no need to reach any of those claims.

of limitations. We find there is plain error, reverse his conviction, and remand for entry of a judgment of acquittal.

## II.

Because Franco-Santiago questions the sufficiency of the evidence supporting his conviction of the charged conspiracy, we relate the facts in the light most favorable to the verdict. See United States v. De Jesús-Viera, 655 F.3d 52, 55 (1st Cir. 2011), cert. denied, 132 S. Ct. 1045 (2012).

The second superseding indictment under which Franco-Santiago was tried charged nine defendants, including Franco-Santiago, who alone went to trial. The government called eight witnesses during Franco-Santiago's trial, among them the police officer who investigated the August 7 robbery, a crime scene technician, a fingerprint expert, a firearms expert, and victims of three of the robberies charged as overt acts, including the victim of the August 7 robbery. The government's most important witness, and the only one who could have tied Franco-Santiago to the other robberies, was Rubén Hernández, an unindicted co-conspirator and government cooperator. The following account comes mostly from Hernández's testimony.

When Hernández came to Puerto Rico from the Dominican Republic in 2000 he held legitimate jobs at first, but he soon met

a man known as Chicky,[4] and the two went on to commit multiple robberies.  Through Chicky, Hernández met Luis,[5] and Luis, in turn, introduced Hernández to appellant Franco-Santiago approximately three months before the payroll robbery of August 7, 2002, in which all three participated.  The exact date of the meeting is unclear, but it was before the plot to do the August 7 payroll robbery was hatched and before the broader charged conspiracy began in July 2002.  The three men met at a residence in Río Piedras, and Luis introduced Franco-Santiago to Hernández as "the police officer" or "the cop."  The prosecution solicited no testimony from Hernández regarding what happened at this meeting or what, if anything, the men discussed.

---

[4]  Chicky is co-defendant José Alberto Santana-Mejia (also known and indicted as Pablo Rodríguez-Rafael).  He pled guilty.

[5]  Luis is co-defendant Luis Mercedes Fernandez.  He pled guilty.  The indictment does not charge Luis with participating in any robbery other than the payroll robbery of August 7, 2002, but Hernández testified that he had committed multiple robberies and a kidnapping with Luis before August 2002.

On July 2, 2002, Chicky and Hernández, along with two other persons named Alex[6] and Raiza,[7] robbed $6,000 from a video store in Santurce. On July 9, 2002, Hernández robbed a supermarket called Centro Ahorros with Chicky, Alex, and a man known as Arlin.[8] And at some point in July 2002 Hernández also robbed a beauty salon with Chicky, a man known as Wellington,[9] and Frank Guerra.[10] There was no evidence that Franco-Santiago was involved in, knew about, or assisted any of these three July 2002 robberies.

At some unknown point after Hernández, Luis, and Franco-Santiago met in Río Piedras, Luis approached Hernández about potentially robbing a businessman: Ernesto Carrasquillo Matos, the

---

[6] Alex is co-defendant Andrés Polanco. The charges against Polanco were dismissed with prejudice as time barred. Polanco was not charged in the original indictment of August 22, 2007, in which Franco-Santiago and seven other defendants were charged. Rather, Polanco was first charged in the second superseding indictment of November 28, 2007, which was returned more than two months after the statute of limitations ran on the charged conspiracy, which allegedly ended in late September 2002. See 18 U.S.C. § 3282(a) (general five-year statute of limitations for non-capital federal crimes).

[7] Raiza is co-defendant Raiza Sánchez, whom Hernández usually referred to during his testimony as "the girl." She pled guilty.

[8] Arlin is co-defendant José Capellan García. He pled guilty.

[9] Wellington is Jairo Del Rosario, an unindicted co-conspirator.

[10] Frank Guerra is co-defendant Francisco Guerra Hernández. This is not the same "Frank" discussed below who planned the August 7 payroll robbery. Guerra jumped bail and the charges against him were dismissed without prejudice because of his status as a fugitive.

owner of a private security firm called CM Express Service. Luis, in turn, had been given the information about the robbery by a man known simply as "Frank," who was not charged in the indictment and not otherwise identified. Frank had private information about the victim, and it was Frank who managed and directed the robbery. There is no evidence that Frank was involved in any of the other four robberies charged as overt acts in the indictment. The plan was to rob Carrasquillo of the cash he withdrew from a bank to pay his company's payroll, which the robbers expected to amount to somewhere between $40,000 and $80,000.

Hernández and Luis had several conversations about how to commit the robbery. Among other things, they discussed needing cars and more guns to pull it off. To solve this firearm shortage, Luis suggested they turn to "a friend," the policeman to whom he had introduced Hernández before: appellant Franco-Santiago. Luis told Hernández that Franco-Santiago would be willing to lend a weapon to carry out the robbery. They also planned to use Franco-Santiago's van as a getaway car.

By the time of the robbery, a group of six had been assembled: Hernández, Luis, Chicky, a man known as El Teniente[11] ("Lieutenant"), a man identified only as Pocho, and appellant

---

[11] El Teniente is co-defendant Narciso Castillo Restituyo. The charges against Castillo Restituyo were dismissed without prejudice because he remained a fugitive. Apparently, he had been erroneously deported.

Franco-Santiago. It is possible that the planner, Frank, was present for the robbery as well. There was no evidence that Hernández, Luis, or Chicky had ever worked with Franco-Santiago, El Teniente, or Pocho before this event.

On the morning of August 7, 2002, Franco-Santiago drove his van to a rendezvous point: the parking lot of the Plaza Carolina shopping center. By this time Franco-Santiago had already lent the robbers his weapon, a 9 mm handgun. Meanwhile, Hernández, Luis, El Teniente, Chicky, Pocho, and possibly Frank drove in two cars to the Banco Santander branch in Carolina.

They watched Carrasquillo enter and leave the bank carrying a briefcase and accompanied by Félix de Motta, an armed CM Express Service employee. Hernández, Luis, and Chicky approached Carrasquillo and de Motta as they left the bank and at gunpoint took Carrasquillo's briefcase, which held the cash he had withdrawn, and de Motta's gun. All three robbers were armed, and one was carrying Franco-Santiago's gun.

El Teniente then drove the group to the Plaza Carolina parking lot where they abandoned El Teniente's car and got into Franco-Santiago's waiting van. From there Franco-Santiago drove the group to a residence which Hernández believed was Franco-Santiago's house. At some point, either while on the ride from the Plaza Carolina to the house or inside the house, Franco-Santiago's gun was returned to him.

-10-

At the house, the robbery proceeds contained in the briefcase -- approximately $46,000 -- were divided up. Hernández, Chicky, Luis, El Teniente, and Franco-Santiago each received about $7,500, as did Frank, who also received the gun that was taken from de Motta; Pocho received about $2,000. The robbers left the house, except for Franco-Santiago, who stayed behind.

Unbeknownst to the robbers, the August 7 robbery, getaway, and change of vehicles were all witnessed by an off-duty Puerto Rico police officer named Concepción who called it in to the command center of the Carolina police precinct. The robbery was investigated by Agent Julio Alicea of the Puerto Rico police, who was given two license plate numbers by Concepción. Both plate numbers belonged to minivans: one a green minivan registered to a woman, the other a blue minivan registered to a man. As a result of an interview with the man, Alicea went to a restaurant in Río Piedras where Franco-Santiago held a second job as a security guard, both to speak with him and to see the blue minivan. Alicea found the blue minivan there, and Franco-Santiago told him that it was his vehicle.

Franco-Santiago was later asked into the Carolina police precinct for questioning, but evidently the Puerto Rico police's investigation into his role in the payroll robbery went no further.

As for the fifth and final robbery charged as an overt act of the overarching conspiracy, some time in late September

-11-

2002, a man known as Marquito[12] approached Hernández about robbing the Julius Restaurant in Puerto Nuevo. Hernández, Marquito, El Teniente, and perhaps one other person known as El Cano robbed the restaurant on the night of September 25, 2002. There is no evidence that Franco-Santiago was involved in or knew about this robbery.

Hernández was asked at trial, of all the robberies he had committed with the individuals he had mentioned in his testimony (including Chicky, Luis, El Teniente, Alex, Raiza, Arlin, Marquito, and Franco-Santiago), "was it always understood that there would be another robbery to do"? Hernández replied that "[w]e were already thieves. Always something came up to do, I would say, yes." Hernández also testified that it was never said before a robbery that it would be the last one.

Not long after the September 25 restaurant robbery, Hernández left Puerto Rico for New York where he continued to commit robberies, now targeting drug dealers. In November or December of 2003, Hernández was arrested in New York. He was transferred to federal custody and soon after began cooperating with federal agents.

---

[12] Marquito is co-defendant Marcos de la Cruz. He pled guilty.

A.      <u>Sufficiency of the Evidence that Franco-Santiago Joined
an Overarching Conspiracy to Commit a Series of Robberies</u>

The topic of whether a defendant who is guilty of participating in one smaller conspiracy proven at trial is also guilty of participating in a larger overarching conspiracy charged in the indictment is one which recurs in a variety of legal contexts.  It often comes up when a defendant argues that he was prejudiced by a variance between the indictment and the facts proved at trial.  <u>See, e.g.</u>, <u>United States</u> v. <u>Dunbar</u>, 553 F.3d 48, 60-61 (1st Cir. 2009); <u>United States</u> v. <u>Perez-Ruiz</u>, 353 F.3d 1, 7 (1st Cir. 2003).  The issue is also raised in cases where the defendant argues that the government may have proven that the defendant joined a smaller conspiracy that falls outside the statute of limitations, but failed to prove a broader overarching conspiracy that extended into the limitations period.  <u>See, e.g.</u>, <u>United States</u> v. <u>Mangual-Santiago</u>, 562 F.3d 411, 421 (1st Cir. 2009); <u>United States</u> v. <u>Rouleau</u>, 894 F.2d 13, 14-15 (1st Cir. 1990).

In this case, Franco-Santiago's argument is not that there were multiple conspiracies rather than a single overarching conspiracy.  <u>Cf., e.g.</u>, <u>United States</u> v. <u>Soto-Beníquez</u>, 356 F.3d 1, 18 (1st Cir. 2003).  It is, instead, that even if there were otherwise proof as to certain defendants that they participated in a single overarching conspiracy, there was no proof that he agreed

to participate in such an overarching conspiracy or even knew about it, much less that his aim was to further or assist that conspiracy. We examine the evidence to determine the proof as to the scope of the conspiracy Franco-Santiago agreed to join. See Grunewald v. United States, 353 U.S. 391, 397 (1957) ("[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines . . . the duration of the conspiracy . . . .").

This case is more like United States v. García-Torres, 280 F.3d 1 (1st Cir. 2002), than the usual single-versus-multiple-conspiracy cases. In García-Torres we reversed a federal drug conspiracy conviction of a defendant who was guilty of kidnapping and murder, but where the evidence was insufficient to prove those crimes were part of an agreement by the defendant to join the drug distribution conspiracy. While the evidence there could support an inference that he knew of the existence of the conspiracy, "it remain[ed] a fatal flaw that virtually no evidence show[ed] that [the defendant] knew, or even had reason to suppose, that the kidnapping and murder were in aid of that conspiracy." Id. at 6. There were plenty of other reasons the defendant could have committed his crimes. Id.

Whether the evidence in this case shows that Franco-Santiago joined a broader conspiracy to commit a series of

-14-

robberies is a question of fact reviewed for sufficiency of the evidence.  See United States v. Niemi, 579 F.3d 123, 127 (1st Cir. 2009).  He preserved the issue of the sufficiency of the evidence to support a conviction for the charged Hobbs Act conspiracy, so we review the challenge to the sufficiency of the evidence de novo, "view[ing] the evidence, both direct and circumstantial -- and including all plausible inferences drawn therefrom -- in the light most favorable to the verdict."  United States v. Rivera Calderón, 578 F.3d 78, 88 (1st Cir. 2009).

In determining whether a jury could reasonably conclude that the defendant participated in the single overarching conspiracy charged or only in a conspiracy encompassing the August 7 robbery, "we ultimately look at the totality of the evidence." Id. at 89 (quoting Mangual-Santiago, 562 F.3d at 421) (internal quotation marks omitted).  Factors helpful in evaluating the evidence are the existence of a common purpose, the interdependence of various elements in the overall plan, and the overlap among the participants.  Id.

This court discussed the variety of problems which arise in this context in United States v. Morrow, 39 F.3d 1228 (1st Cir. 1994).  We warned against the confusion that would ensue if there were undue focus on the group rather than on what the agreement was.  As we said in Morrow,

> at a minimum, a conspirator must have knowledge or foresight of the conspiracy's

multiplicity of objectives before that defendant is convicted of a multiple-crime conspiracy. Conviction for such a multiple-crime conspiracy remains possible even if the conspiracy is open-ended (e.g., a conspiracy to rob banks) and the specifics of the future crimes (e.g., which banks) is undetermined or at least unknown to the defendant. But if a defendant agrees with others simply to commit a single crime (e.g., to rob one bank) and has no knowledge or foresight of the conspiracy's broader scope, that defendant is a member only of the narrower, one-crime conspiracy.

Id. at 1234.

This requirement that at a minimum the defendant must know or foresee the multiple-crime conspiracy's broader scope follows from the rule that to prove the elements of conspiracy, the government must prove that the defendant intended to agree[13] with

---

[13] In United States v. Morrow, 39 F.3d 1228 (1st Cir. 1994), we stated that a "fundamental . . . cause of confusion" in the law of conspiracy is

"the verbal ambiguity which leads courts [sometimes] to deal with the crime of conspiracy as though it were a group rather than an act [i.e., of agreement]." Developments in the Law: Criminal Conspiracy, 72 Harv. L. Rev. 920, 934 (1959). To emphasize "agreement," the core concept in conspiracy, Iannelli v. United States, 420 U.S. 770, 777 (1975), implies that "scope" is to be resolved by asking what the defendant agreed to do, or at least knew to be likely. By contrast, if the "group" character of the crime is emphasized, "scope" may seem more to be a function of how the enterprise conducted itself rather than what any one individual had in mind.

Id. at 1234 (alterations in original).

his co-conspirators to commit the substantive offense and <u>intended to commit</u> that offense. <u>United States</u> v. <u>Pérez-González</u>, 445 F.3d 39, 49 (1st Cir. 2006). An agreement, of course, requires knowledge of what is being agreed to: "No one can join a conspiracy without knowledge of its existence -- the gravamen is an <u>agreement</u> to commit an offense." <u>United States</u> v. <u>García-Torres</u>, 280 F.3d 1, 4 (1st Cir. 2002). The government does not have to prove that the defendant has "knowledge of every other participant, or of the details of the conspiracy," <u>Mangual-Santiago</u>, 562 F.3d at 422, but knowledge of the broader conspiracy's existence is "critical," <u>García-Torres</u>, 280 F.3d at 4; <u>see</u> <u>also</u> <u>United States</u> v. <u>Sánchez-Badillo</u>, 540 F.3d 24, 31 (1st Cir. 2008) ("[W]e find that the totality of the government's evidence was sufficient to prove the existence of a single conspiracy, <u>and to prove appellants' knowing participation in it</u>." (emphasis added)).

As the recitation of the evidence shows, there was more than sufficient evidence to convict Franco-Santiago of participating in a conspiracy to commit the single payroll robbery of August 7, 2002. However, that is not the crime with which Franco-Santiago was charged. Instead, he was charged with conspiring to commit a series of robberies from July 2002 through September 2002, and there the government's case failed, even if we consider only the August 7 and September 25, 2002, robberies.

In Hernández's detailed testimony about the video store robbery of July 2, 2002, and the restaurant robbery of September 25, 2002, he never testified that Franco-Santiago knew of these crimes, much less that he in any way participated in them or that Franco-Santiago agreed to join an ongoing robbery conspiracy with multiple targets.[14] Nor did Hernández's much less detailed testimony regarding the July 2002 robberies of a supermarket and a beauty salon even hint that Franco-Santiago participated in or knew about those two robberies. Indeed, Hernández did not mention Franco-Santiago at all in connection with any of these four robberies, before and after August 7, 2002. Notably, Hernández was never asked by the prosecution about the content of any conversations he had with Franco-Santiago.

Apart from his testimony about the August 7 payroll robbery, Hernández discussed Franco-Santiago in his testimony only once. Hernández testified that approximately three months before

---

[14] Our conclusion in this case is not based on the fact that there was no overt act as to Franco-Santiago within the statute of limitations period. Evidence of an overt act is not required to establish a Hobbs Act conspiracy, United States v. Palmer, 203 F.3d 55, 63 (1st Cir. 2000), and where a conspiracy does not require an overt act, it "continues as long as its purposes have neither been abandoned nor accomplished," United States v. Torres Lopez, 851 F.2d 520, 525 (1st Cir. 1988) (discussing RICO conspiracy, which similarly does not require an overt act); see also United States v. Persico, 832 F.2d 705, 713 (2d Cir. 1987). As discussed, we conclude that the evidence shows that Franco-Santiago agreed only to commit the single payroll robbery with others. That particular conspiracy ended when the payroll robbery was accomplished on August 7, 2002.

the payroll robbery, Luis introduced him to Franco-Santiago at a meeting in a house in Río Piedras. However, the government did not successfully elicit any admissible testimony from Hernández as to what, if anything, the three men discussed: whether they discussed a plan to commit a series of robberies, or a plan to commit the single robbery of August 7, 2002, or merely something else.[15]

The government has put great weight on Hernández's testimony that it was always generally understood that there would be another robbery to do as sufficient to tie Franco-Santiago to the other robberies. But this statement was not specific to Franco-Santiago and is not enough.

Nor do we see a basis for rational inferences sufficient to support the conviction of the conspiracy charged. The fact that Franco-Santiago's gun was returned to him and he was paid his full share after the payroll robbery weighs in favor of concluding that his participation was completed rather than ongoing. Further, there was no evidence that his gun was used in any other robbery or that he received any other payment.

---

[15] The prosecutor initially attempted to question Hernández about conversations he had with co-conspirators, and Hernández began to testify about the planning for the August 7 robbery. Defense counsel objected to the admission of those co-conspirator statements on the basis that the government had not yet made out a prima facie case of conspiracy, citing United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977). The district court told the prosecutor not to elicit any more co-conspirator statements until he had satisfied the conditions for admitting such statements. The prosecutor moved on and never brought up the matter again.

In addition, the robbery in which Franco-Santiago did participate is notably different from the other robberies encompassed by the charged overarching conspiracy, again providing no basis for inferences supporting his conviction. That August 7 payroll robbery was one of cash from a person, whereas the other four robberies were all robberies of places of business. Nor is the cast of characters identical. Of the nine co-defendants charged in the second superseding indictment, only four participated in the August 7 payroll robbery: Chicky, Luis, El Teniente, and Franco-Santiago. Further, the very nature of this conspiracy, unlike drug rings, does not permit easy inferences based on some commonality of participants. As we said in Morrow, this was not "the type of conspiracy, such as a drug ring, where knowledge that multiple crimes are intended may be rather easily inferred based on common practice."[16]  39 F.3d at 1235.

The factors frequently used to establish agreement to participate in a single overarching conspiracy -- common goal, interdependence, overlapping participants -- do not help the government close the gap between what the evidence showed and what

_____

[16]  We have upheld convictions of defendants for participating in a single overarching conspiracy to commit a series of robberies of supermarkets. See United States v. LiCausi, 167 F.3d 36 (1st Cir. 1999). There the evidence was much stronger: there were "meetings involving all of the defendants and relating to supermarket robberies, shared equipment contributed by different members of the group, common participants and similar logistical arrangements, and close contact among members of the group during the life of their association." Id. at 45.

the government had to prove to convict Franco-Santiago of participating in the broader conspiracy.

While the evidence showed that Hernández and some of Franco-Santiago's co-defendants shared the common goal or purpose of committing a series of robberies, there was no such evidence as to Franco-Santiago. See Morrow, 39 F.3d at 1234.

As to interdependence, we have said that "[e]ach individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key." Manqual-Santiago, 562 F.3d at 422 (quoting United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999)) (internal quotation marks omitted). Here, all the evidence shows is Franco-Santiago's "mere participation in some branch of the venture" charged, and no interdependency. There was no evidence that Franco-Santiago knew that his participation in the August 7 payroll robbery was "necessary or advantageous to the success of another aspect of the scheme" charged, as required to show interdependence. Rivera Calderón, 578 F.3d at 89 (quoting Manqual-Santiago, 562 F.3d at 422) (internal quotation marks omitted).

While our cases have held that "the overlap factor is 'satisfied by the pervasive involvement of a single core conspirator, [or] hub character,'" Manqual-Santiago, 562 F.3d at 422 (alteration in original) (quoting Portela, 167 F.3d at 695)

-21-

(internal quotation marks omitted), that does not assist the government here. There was a hub character -- Hernández. However, the mere fact that a central person (the "hub" of a wheel) is involved in multiple conspiracies (the wheel's "spokes") does not mean that a defendant such as Franco-Santiago who participated in a spoke conspiracy may be convicted of participating in an overarching conspiracy encompassing the entire wheel. There must also be evidence from a which a jury could reasonably infer that the spoke defendant knew about and agreed to join any larger overarching conspiracy. Cf. United States v. Huff, 609 F.3d 1240, 1244 (11th Cir. 2010) ("[W]here the 'spokes' of a conspiracy have no knowledge of or connection with any other, dealing independently with the hub conspirator, there is not a single conspiracy, but rather as many conspiracies as there are spokes." (quoting United States v. Chandler, 388 F.3d 796, 807 (11th Cir. 2004)) (internal quotation marks omitted)).

This is implicit in our 2009 holding in Niemi, supra. In that case we rejected the defendant Niemi's argument that there was insufficient evidence that he participated in a single, overarching drug-distribution conspiracy as charged in the indictment, concluding that "the evidence showed a classic hub-and-spoke conspiracy with Mercier at the center and Niemi as an important spoke." 579 F.3d at 127. We held that "[t]he jury could have reasonably concluded that Niemi knew of the existence and scope of

Mercier's operations, and <u>knew</u> that his own ability to obtain and sell drugs depended on the success of the conspiracy as a whole." <u>Id.</u> (emphasis added).

In <u>Niemi</u>, as in <u>Morrow</u>, the defendant's knowledge of the existence of an overarching conspiracy -- of which Mercier was the hub -- was key. Here, unlike in <u>Niemi</u>, there was no such evidence that Franco-Santiago knew of the "existence and scope" of the larger conspiracy of which Hernández was the hub. Similarly, in <u>United States</u> v. <u>Swafford</u>, 512 F.3d 833 (6th Cir. 2008), the Sixth Circuit held that the government had failed to prove a single overarching conspiracy to sell illegal drugs. The court stated that "the government's metaphorical argument that this was a 'wheel conspiracy' (or 'hub-and-spoke' conspiracy) -- wherein the defendant served as the hub connected to each of the customers via a spoke . . . -- fails because <u>no common goal or enterprise existed</u>." <u>Id.</u> at 842 (emphasis added).

Our conclusion that the evidence of the overarching conspiracy charged, including the September 25 restaurant robbery, is insufficient is confirmed by the prosecutor's admissions at Franco-Santiago's sentencing hearing. The government conceded that for the purpose of calculating his guidelines sentencing range, the three July 2002 robberies and the restaurant robbery of September 25, 2002, should not be attributed to Franco-Santiago because there

-23-

had been no evidence that those events were either known or foreseeable to him.  The district court agreed.

B.        Consequences of the Insufficiency Finding

This difference -- between the narrow conspiracy the government proved at trial and the broader conspiracy it charged in the indictment but did not prove -- matters.  It matters in this case not because there was a variance between the proof and the indictment,[17] but because of the five-year federal statute of limitations for non-capital crimes, 18 U.S.C. § 3282(a).  See United States v. Bucci, 839 F.2d 825, 829 (1st Cir. 1988) (stating that "the statute of limitations for a Hobbs Act violation is five years"); see also United States v. Agne, 214 F.3d 47 (1st Cir. 2000) (vacating a wire fraud conviction because the indictment was untimely under the five-year statute of limitations of 18 U.S.C. § 3282 and the government failed to prove that the defendant's actions affected a financial institution so as to trigger the ten-year statute of limitations of 18 U.S.C. § 3293(2)); United States

---

[17]  A variance occurs when the crime charged in the indictment remains unaltered, but the evidence adduced at trial proves facts different from those alleged in the indictment.  United States v. Yelaun, 541 F.3d 415, 419 (1st Cir. 2008).  While there was technically a variance here, it was not prejudicial. See id.  The second superseding indictment under which Franco-Santiago was tried gave him ample notice of the events charged.  See Morrow, 39 F.3d at 1235 (holding that a variance between the multiple-crime conspiracy charged in the indictment and the single-crime conspiracy proved at trial was not prejudicial where "the indictment gave appellants ample notice of the events charged").  Franco-Santiago would not be entitled to a reversal of his conviction on the ground of variance alone.

v. Doherty, 867 F.2d 47 (1st Cir. 1989) (reversing a mail fraud conspiracy conviction for conspiring to obtain a promotion through the use of a stolen police sergeant's exam because the ongoing receipt of increased salary as a result of the conspiracy's success was not an overt act within the statute of limitations); United States v. Juodakis, 834 F.2d 1099 (1st Cir. 1987) (per curiam) (reversing a conviction for manufacturing illegal drugs where the government failed to prove "beyond a reasonable doubt the existence of the particular conspiracy -- as determined by the defendant's agreement -- within the limitations period").

We view the matter through a particular standard of review. The statute of limitations is an affirmative defense which a criminal defendant has the responsibility of raising and preserving before or at trial if he seeks its benefit. See United States v. Thurston, 358 F.3d 51, 63 (1st Cir. 2004), vacated on other grounds by 543 U.S. 1097 (2005). A defendant's failure to do so results in forfeiture of the defense.[18]  Id.

---

[18]  This circuit is in the minority in holding that a statute of limitations defense not raised and preserved before or at trial is forfeited (and subject to plain error review) rather than waived (and not subject to review at all).

The Second, Third, Fourth, Fifth, Ninth, Tenth, and Eleventh Circuits apply waiver. See United States v. Walsh, 700 F.2d 846, 855-56 (2d Cir. 1983); United States v. Karlin, 785 F.2d 90, 92-93 (3d Cir. 1986); United States v. Williams, 684 F.2d 296, 299-300 (4th Cir. 1982); United States v. Arky, 938 F.2d 579, 582 (5th Cir. 1991) (per curiam); United States v. LeMaux, 994 F.2d 684, 689-90 (9th Cir. 1993); United States v. Gallup, 812 F.2d 1271, 1280 (10th Cir. 1987); United States v. Siegelman, 561 F.3d 1215, 1232 (11th Cir. 2009), vacated on other grounds by 130 S. Ct. 3542 (2010).

Franco-Santiago did raise but did not adequately preserve the statute of limitations as a defense before his trial.[19]  It is undisputed that Franco-Santiago did not raise the statute of

_____

The Seventh Circuit applies the forfeiture rule, see United States v. Baldwin, 414 F.3d 791, 795 & n.2 (7th Cir. 2005), overruled on other grounds by United States v. Parker, 508 F.3d 434 (7th Cir. 2007), and the Sixth Circuit has held that "absent an explicit waiver, the statute of limitations presents a bar to prosecution that may be raised for the first time on appeal," United States v. Crossley, 224 F.3d 847, 858 (6th Cir. 2000).  The Eighth and D.C. Circuits apparently have not squarely addressed whether failure to raise the statute of limitations as a defense before or at trial is treated as waiver or forfeiture.  See United States v. Soriano-Hernández, 310 F.3d 1099, 1103-04 (8th Cir. 2002) (holding that a statute of limitations defense is waived by a guilty plea); United States v. Wilson, 26 F.3d 142, 155-56 (D.C. Cir. 1994) (holding that a statute of limitations defense may be waived knowingly, intelligently, and voluntarily).

In this case the government has not argued that we should treat Franco-Santiago's argument under the statute of limitations as waived rather than forfeited.  We follow our precedent and review for plain error.  See United States v. Thurston, 358 F.3d 51, 63 (1st Cir. 2004), vacated on other grounds by 543 U.S. 1097 (2005); United States v. O'Bryant, 998 F.2d 21, 23 & n.1 (1st Cir. 1993).

[19]  There was one attempt to raise the issue.  On April 7, 2008, one of Franco-Santiago's co-defendants, Luis, moved to dismiss the indictment on statute of limitations grounds based on, among other arguments, the fact that the indictment did not name him as a participant in the restaurant robbery of September 25, 2002.  Two days later, Franco-Santiago moved to join Luis's motion to dismiss.  Before the court acted on Franco-Santiago's joinder motion, a magistrate judge recommended on April 22, 2008, that the court deny Luis's motion to dismiss because, among other things, whether he was a member of an overarching conspiracy to commit a series of robberies was a question of fact that could not be resolved by a motion to dismiss.  On May 29, 2008, the district court "noted" Franco-Santiago's joinder motion.  On March 12, 2010, the court accepted the magistrate judge's recommendation, to which Luis had untimely objected and Franco-Santiago had not objected at all.  The district court's order denying the motion to dismiss only referenced Luis, not Franco-Santiago.

limitations defense at trial, so he did not preserve the issue. See United States v. Rogers, 118 F.3d 466, 474 (6th Cir. 1997) (defendant "never argued withdrawal or abandonment at trial; therefore he failed to preserve the issue" of whether he withdrew from or abandoned the conspiracy before the limitations period, "despite having raised [the issue] in his pretrial motion to dismiss"); United States v. Wilson, 26 F.3d 142, 159-60 (D.C. Cir. 1994) (ordinarily, when a trial court denies a motion to dismiss the indictment because the motion raises questions of fact, the defendant must renew his objection at trial).

Because he did not raise his statute of limitations defense at trial, we review for plain error. See United States v. Olano, 507 U.S. 725, 731-32 (1993); Fed. R. Crim. P. 52(b). Under plain error review, Franco-Santiago must show "(1) there is an error; (2) the error is plain or obvious; (3) the error 'affected [his] substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings;' and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" De Jesús-Viera, 655 F.3d at 57 (second alteration in original) (quoting United States v. Gerhard, 615 F.3d 7, 22 (1st Cir. 2010)) (internal quotation marks omitted).

We have held there was error; it was sufficiently clear that the government acknowledged at sentencing that the only

-27-

ongoing offense, the September 25 robbery, was not known or foreseeable to Franco-Santiago. The prejudice to him is obvious.

The fourth prong is closer. The question is whether allowing the time-barred conviction to stand "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 736 (alteration in original) (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)) (internal quotation marks omitted). On the one hand, Franco-Santiago did commit a very serious crime, one which easily could have ended in death or injury. He also was a police officer who betrayed his badge and the public trust inherent in his position.

On the other hand, there are reasons not to let the conviction stand. The Supreme Court has said that

> [t]he purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past.

Toussie v. United States, 397 U.S. 112, 114-15 (1970). And it is in the interests of fairness and integrity that the prosecution be held to the rules governing its own conduct, including in a situation such as this. "'Every statute of limitations, of course, may permit a rogue to escape,' but when a court concludes that the

statute does bar a given prosecution, it must give effect to the clear expression of congressional will that in such a case 'no person shall be prosecuted, tried, or punished.'"  Id. at 123-24 (citation omitted) (quoting Pendergast v. United States, 317 U.S. 412, 418 (1943); 18 U.S.C. § 3282).

Here the government had the information it needed to bring an indictment before the statute of limitations on the August 7 payroll robbery expired.  No good reason is evident from the record for its failure to do so.  In addition, if Hernández had evidence tying Franco-Santiago to the larger conspiracy, the government could easily have solicited it after following the district court's instruction to lay a proper Petrozziello foundation.  See United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977).  The government's own conduct has brought about this result, calling into question the integrity and fairness of the process.  See United States v. Peña-Lora, 225 F.3d 17, 27 (1st Cir. 2000) (reversing a firearms conviction for insufficient evidence on plain error review where inconsistent testimony made it impossible for the jury to find the defendant guilty beyond a reasonable doubt and "the government invited these testimonial inconsistencies"); see also United States v. Vázquez-Rivera, 665 F.3d 351, 364 (1st Cir. 2011) (finding plain error where the government excessively relied on improper testimony to convict the defendant of possession of child pornography, and stating that the

errors "unfairly impaired the integrity of [the defendant's] trial"); United States v. Carrasco, 540 F.3d 43, 54 (1st Cir. 2008) (finding plain error where the trial court admitted the defendant's confession for impeachment after having ruled that it was inadmissible, and stating that "allowing such an error to go uncorrected even though it may well have meant the difference between conviction and acquittal would certainly erode public confidence in the integrity of judicial proceedings"); United States v. Fuchs, 218 F.3d 957, 963 (9th Cir. 2000) ("Allowing defendants' convictions to stand, given the likelihood that the jury may not have convicted had they been properly instructed, would be a 'miscarriage of justice.'").

IV.

We reverse Franco-Santiago's conviction and remand the matter for entry of a judgment of acquittal.