# United States Court of Appeals
## For the First Circuit

No. 11-2157

UNITED STATES OF AMERICA,

Appellee,

v.

JUSTIN GREEN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, U.S. District Judge]

Before

Howard, Stahl, and Lipez,
Circuit Judges.

Fred Haddad for appellant.
Linda M. Ricci, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief for appellee.

October 31, 2012

**STAHL**, **Circuit Judge**.   A jury convicted defendant-appellant Justin Green of participating in an oxycodone distribution conspiracy, and he received a sentence of 210 months. On appeal, he raises several challenges to his conviction and sentence, the most important of which is that the district court erred in refusing to suppress evidence that Drug Enforcement Administration (DEA) agents obtained from Green's cellular telephone, without a warrant, two weeks after they seized the phone.   We find that any error was harmless and therefore leave for another day the question of whether the agents' activity was lawful under the Fourth Amendment.   Because Green's other claims also lack merit, we affirm.

## I. Facts & Background

Given that this appeal follows a conviction, we recount the facts in the light most favorable to the verdict.   United States v. Poulin, 631 F.3d 17, 18 (1st Cir. 2011).

In the fall of 2008, the DEA began investigating a suspected oxycodone trafficking operation in and around Fall River, Massachusetts.   With the help of a cooperating witness, the DEA identified Gilberto Aguiar as one of the participants and received court authorization to intercept calls and text messages on Aguiar's cell phone, as well as on the phones of Aguiar's suspected supplier, Dimas Almeida, and Almeida's suspected supplier, Aaron Tripp.   The DEA agents intercepted calls between Tripp and a man

-2-

named Mark Carrolton, which revealed that Tripp was planning to travel to Florida to buy several hundred thousand dollars' worth of pills. Carrolton arranged for an individual named "J" or "Justin" (later identified as the defendant, Justin Green) to supply Tripp with 30,000 30-milligram oxycodone pills and 2,500 80-milligram pills. Carrolton also arranged for a second supplier named "Twin" to provide Tripp with 500 80-milligram oxycodone pills.

Tripp's trip to Florida was delayed for a week or so, and on May 1, 2009, Carrolton received a text message from Green stating the following: "I cant [sic] hold these for any longer. My people are backed up and jumping down my throat. Im [sic] going to have [sic] get rid of them to someone else if he isnt [sic] @erious [sic]." Carrolton forwarded that message to Tripp, warning Tripp that he could not "buy much more time" and telling him to read the forwarded message from "J." During a conversation with Tripp that same day, Carrolton confirmed that Tripp was bringing enough cash (at least $300,000 or $350,000) to Florida for the transaction and, at the end of the conversation, told Tripp that he was "going to call Justin right now." Carrolton then immediately placed six calls to Green's cell phone number.

On May 5, 2009, on his way down to Florida, Tripp was pulled over by local law enforcement officers in South Carolina, who seized $396,000 in cash from Tripp as part of a search of his vehicle. Later that day, the DEA agents intercepted a call from

Tripp to Carrolton, in which Tripp reported what had happened and told Carrolton to "ditch" his phone. Carrolton responded that he would "call 'J'" and talk to Tripp later. Carrolton then made three attempts to reach Green's cell phone number. Carrolton also sent a text message to the same number that night.

On May 6, 2009, the DEA agents persuaded Tripp to cooperate with them. At the agents' direction, Tripp placed several (recorded) calls to Carrolton and told Carrolton that he would return to Massachusetts for more money and then meet Carrolton and Green in Florida to complete the transaction as planned.

On May 7, 2009, at approximately 7:30 p.m., Tripp once again called Carrolton, to finalize the plans for the drug deal. Shortly thereafter, Carrolton and Green arrived at a Holiday Inn Express in Fort Lauderdale, where the DEA agents had arranged for Tripp to rent a room. When Carrolton and Green (who arrived separately) knocked on Tripp's hotel room door, the DEA agents opened the door and identified themselves. Green ran down the hallway, but the agents stopped him and arrested him. The agents also arrested Carrolton.

At the time of the arrests, the DEA agents seized a cell phone, backpack, and two bags of pills from Carrolton (containing 748 30-milligram oxycodone pills and 442 80-milligram oxycodone pills). Carrolton later testified at trial that "Twin" had

-4-

supplied some of those pills and that the rest were from Green. The agents also seized two cell phones from Green: a black MetroPCS Samsung phone and a Blackberry device.

Two weeks after Green's arrest, on May 21, 2009, DEA Special Agent Carl Rideout, by then back in Massachusetts, removed the back outside casing and battery from each of Green's cell phones and retrieved the International Mobile Subscriber Identity (IMSI) number from each.[1] Agent Rideout did not have a warrant. According to the government, the "DEA agents used the IMSI numbers to obtain toll and subscriber information (including the telephone numbers) for the cellular telephones. Agents learned, among other things, that the telephone number associated with Green's MetroPCS black Samsung cellular telephone was (954) 245-2759."

In June 2009, Green, Carrolton, Tripp, and others were charged with conspiring to possess with intent to distribute and to distribute oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. § 846. On March 31, 2010, Green filed a motion to suppress the cell phones and all evidence obtained from them, and on October 15, 2010, the district court heard oral argument on that motion. Shortly thereafter, on November 1, 2010, Agent Rideout obtained consent from Carrolton to activate

---

[1] The district court described an IMSI number as a "unique identifying number[] assigned to the computer chip[] installed on" a cell phone. United States v. Green, No. 09-10183-GAO, 2011 WL 86681, at *2 (D. Mass. Jan. 11, 2011). The number is also printed on the inside of the phone itself.

-5-

Carrolton's cell phone (seized from him at the scene) and retrieve Green's number from the phone's electronic address book, listed under the name "JSTN." That number matched the one that the DEA had obtained using Green's IMSI number. That same day, the government filed a supplemental response to Green's motion to suppress, arguing that the "inevitable discovery" doctrine applied, see Nix v. Williams, 467 U.S. 431, 446-47 (1984), because the DEA would have obtained Green's phone number through the consensual search of Carrolton's phone and then, using that number, would have subpoenaed Green's toll records.[2] On January 11, 2011, the district court denied Green's motion to suppress, finding that the retrieval of his IMSI number did not constitute a "search" within the meaning of the Fourth Amendment. See United States v. Green, No. 09-10183-GAO, 2011 WL 86681, at *3-4 (D. Mass. Jan. 11, 2011).

At trial, Carrolton and Tripp testified against Green, as did a man named William Conda, who had obtained oxycodone from Green in the past and who introduced Green to Carrolton. After a four-day trial, the jury convicted Green. The district court imposed a below-guideline sentence of 210 months in prison and three years of supervised release. This appeal followed.

---

[2] Toll records, which a telephone company compiles, detail, among other things, the phone numbers a subscriber has called and received calls from in a given month.

## II. Analysis

Green raises four claims on appeal. First, he argues that the district court should have granted his motion to suppress, because the DEA agents' retrieval of his IMSI number from his cell phone constituted a Fourth Amendment search. Second, he contends that the district court violated Federal Rules of Evidence 403 and 404(b) by admitting the testimony of William Conda, because Conda discussed Green's prior bad acts that fell outside the time period of the charged conspiracy. Third, Green challenges the sufficiency of the evidence against him. Fourth, he urges us to find clear error in the district court's drug quantity calculation. We address each claim in turn.

### A. The motion to suppress

In the typical case in which a defendant challenges the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Symonevich, 688 F.3d 12, 18 (1st Cir. 2012). Here, however, we need not delve into the district court's decision, because we find that there was ample evidence to convict Green even without the information that the DEA agents obtained from his cell phone after his arrest.[3]

---

[3] Though Green argued in his brief on appeal that the DEA agents did not have probable cause to arrest him, and thus that his cell phones were not seized incident to a lawful arrest, he conceded at oral argument that what occurred on May 7, 2009 was indeed an arrest, supported by probable cause. See United States

The two cell phones seized from Green at the time of his arrest were a black MetroPCS Samsung phone and a BlackBerry device. Two weeks later, after returning to Massachusetts, Agent Rideout opened the back of each phone, removed the battery, and obtained each phone's IMSI number. The IMSI number of the Samsung phone was visible on the phone after the battery was removed, and the IMSI number of the Blackberry phone was on a card inserted into a slot where the battery had been. Because the government does not appear to have introduced any evidence at trial that it acquired using the Blackberry's IMSI number, we focus on the retrieval of the IMSI number from the Samsung device. The DEA agents used that IMSI number to determine that (954) 245-2759 was the phone number associated with the phone, to obtain Green's toll records from MetroPCS, and to obtain what the government has described as other "subscriber information." The government's brief does not make clear what that other subscriber information included, nor has either party provided us with the trial exhibit that might answer

v. Robinson, 414 U.S. 218, 235 (1973) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification."). In any event, even if Green had not conceded the point, we would have found that the DEA agents relied on "reasonably trustworthy facts and circumstances" and had "information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime" when they arrested Green. United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997). The seizure of Green's cell phones therefore did not violate the Fourth Amendment. See Robinson, 414 U.S. at 235.

that question. When asked, at oral argument, exactly what information can be gleaned about a subscriber using his IMSI number, neither party was able to provide an answer.

The question Green raises -- whether the DEA agents' retrieval of his IMSI number constituted a search within the meaning of the Fourth Amendment[4] -- is not, in our view, an easy one. It implicates an important and developing area of Fourth Amendment law: the extent of the privacy interest that an individual has in his cell phone and cellular communications. See, e.g., United States v. Flores-Lopez, 670 F.3d 803 (7th Cir. 2012); United States v. Finley, 477 F.3d 250, 258-60 (5th Cir. 2007); cf. United States v. Jones, 132 S. Ct. 945, 957 (2012) (Sotomayor, J., concurring). But we find this case to be the wrong vehicle for exploring those novel issues, both because the record is insufficiently developed and because, even assuming that a Fourth Amendment search occurred here, any error was harmless.

---

[4] Green also argues that, if a Fourth Amendment search did occur here, it was not authorized by the search-incident-to-arrest exception, see Robinson, 414 U.S. at 235, given the two-week delay between the seizure of his cell phone and the retrieval of his IMSI number. It is worth noting, however, that the government would bear the burden of invoking any exception to the warrant requirement, see Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971), and it has not argued in its brief on appeal that the search-incident-to-arrest exception applies here. The government claims only that the retrieval of Green's IMSI number did not constitute a search, because an individual does not have a reasonable expectation of privacy either in his IMSI number, which is shared with the telephone company, or in the inside casing of his cell phone. See Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

The admission of evidence obtained in violation of the Fourth Amendment is harmless if the government can "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24 (1967); see also United States v. Salimonu, 182 F.3d 63, 71 (1st Cir. 1999). The government urges us to apply a more lenient standard, claiming that the improper admission of evidence is harmless if it is "highly probable that the error did not influence the verdict." United States v. Flores-de-Jesús, 569 F.3d 8, 27 (1st Cir. 2009) (citation and internal quotation marks omitted). But, as we recently reiterated, "[t]here are two barometers for measuring harmless error in a criminal case," and the stricter harmless-beyond-a-reasonable-doubt standard applies "to issues of constitutional dimension," like the one presented here. United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012). Despite the fact that the government has articulated the wrong standard, however, it has satisfied the correct one.

The government maintains, and Green does not dispute, that if the district court had granted Green's motion to suppress, the only evidence that would not have been admitted at trial was that the particular Samsung cell phone that the agents seized from him on May 7, 2009 was assigned telephone number (954) 245-2759. Though the DEA agents did also obtain Green's toll records using his IMSI number, the government apparently did not use those

records at trial. The government submitted a chart summarizing Carrolton's telephone contacts with Green, but that chart was based entirely on Carrolton's toll records, obtained with his consent.

The other piece of evidence that the DEA agents obtained using Green's IMSI number was that his telephone number was (954) 245-2759, but that evidence would still have come in at trial, through Carrolton's testimony and information obtained from Carrolton's phone with his consent.[5] Perhaps more importantly, Green stipulated at trial that (954) 245-2759 was "the mobile telephone number assigned to a telephone used by Justin Green."

Furthermore, there was a great deal of other evidence connecting Green to the conspiracy. That evidence, discussed above and at more length below, included the trial testimony of co-conspirators Carrolton and Tripp, the intercepted wire communications between and among Green's co-conspirators, the fact that Green arrived at the Holiday Inn Express on May 7, 2009 for

---

[5] This included Carrolton's toll records and the fact that his cell phone address book listed number (954) 245-2759 under the name "JSTN." The government suggests that the evidence obtained using Carrolton's cell phone thus provided an "independent source" for the information contained in Green's toll records, see Murray v. United States, 487 U.S. 533, 537 (1988), or that the DEA would have "inevitably discovered" those toll records by issuing a subpoena to MetroPCS once Carrolton gave the agents Green's cell phone number, see Nix, 467 U.S. at 446–47. However, the district court record indicates that the Samsung phone was a prepaid device and that the MetroPCS account did not reflect Green's own name as the subscriber. Thus, as we understand it, only Green's IMSI number allowed the government to definitively link Green to the specific Samsung phone seized from him on May 7, 2009.

the expected drug transaction, and the fact that Green fled when the DEA agents confronted him.

We cannot imagine that the jury would have rendered a different verdict in the absence of the one, relatively minor, piece of evidence derived exclusively from the retrieval of Green's IMSI number: namely, that the particular phone he was carrying on the day he was arrested was assigned telephone number (954) 245-2759.  We therefore find beyond a reasonable doubt that any error here did not contribute to the verdict, see Chapman, 386 U.S. at 24, and we leave the Fourth Amendment question for another day.

## B.  The testimony of William Conda

Green's second claim is that the district court should not have admitted the testimony of William Conda, who had prior drug dealings with Green leading up to Green's participation in the conspiracy, because Conda's testimony concerned events that occurred before the time period alleged in the indictment and thus implicated Green's "prior bad acts" under Federal Rule of Evidence 404(b).  Green also contends that the testimony was unfairly prejudicial.  See Fed. R. Evid. 403.  We review Green's preserved evidentiary challenge for abuse of discretion.  United States v. Mare, 668 F.3d 35, 38 (1st Cir. 2012).

The indictment in this case alleged that the conspiracy to distribute oxycodone took place "[b]eginning on an unknown date but at least by in or about October, 2008, and continuing

thereafter until in or about May, 2009." Conda testified to events that seem to have occurred from October 2004 through 2006 or 2007, arguably before the time period explicitly alleged in the indictment.[6] The essence of Conda's testimony was that: a man named Bill introduced him to Green; Conda obtained oxycodone pills from Green; Conda met Carrolton through work in 2006 and began taking oxycodone pills with Carrolton after work; Conda acted as a middleman by obtaining pills for himself and Carrolton from Green; and Conda eventually introduced Carrolton to Green as his source for oxycodone.

Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but it "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). "The prohibition against 'other acts' evidence typically refers to evidence that is extrinsic to the crime charged and introduced for the purpose of showing propensity." United States v. Gobbi, 471 F.3d 302, 311 (1st Cir. 2006). The district court found that Conda's testimony

---

[6] We say "arguably" because the indictment did include the "[b]eginning on an unknown date" language, but the government has not invoked that language to argue that the acts about which Conda testified fell within the time frame of the indictment.

-13-

did not implicate Rule 404(b), because it was, in the court's words, "evidence tending to establish the charged conspiracy." See United States v. Villarman-Oviedo, 325 F.3d 1, 11 (1st Cir. 2003) (holding that where evidence is not of "other crimes, wrongs, or acts" but is intrinsic to the crime charged, "Rule 404(b) is really not implicated at all").

We can bypass the question of whether the "other acts" at issue here were intrinsic or extrinsic. They were, in any event, admissible under Rule 404(b), so any error was harmless. We have repeatedly held that, in a conspiracy case, "evidence of other bad acts . . . can be admitted to explain the background, formation, and development of the illegal relationship, and, more specifically, to help the jury understand the basis for the co-conspirators' relationship of mutual trust." United States v. Escobar-de Jesus, 187 F.3d 148, 169 (1st Cir. 1999) (internal citations omitted); see also United States v. Balthazard, 360 F.3d 309, 317-18 (1st Cir. 2004) (finding evidence of a drug transaction admissible where the government failed to prove that the transaction occurred during the time frame of the conspiracy, because it was evidence of the "background, formation, and development of the illegal relationship" (citation and internal quotation marks omitted)). Green has articulated no reason why that rule should not apply to Conda's testimony.

Even if evidence is admissible under Rule 404(b), however, the district court must exclude it "if its probative value is substantially outweighed" by a "danger of unfair prejudice." Fed. R. Evid. 403; see also United States v. Varoudakis, 233 F.3d 113, 121 (1st Cir. 2000) ("Prior bad act evidence that surmounts the bar of Rule 404(b) may still be inadmissible under Rule 403."). Green's Rule 403 claim is that Conda's testimony was unfairly prejudicial because it "paint[ed] [Green] as an oxycodone dealer, with such proclivities." But there was ample other evidence from which the jury could reasonably have concluded that Green was, indeed, an oxycodone dealer, and we thus fail to see how Conda's testimony had any "undue tendency to suggest decision on an improper basis." Fed. R. Evid. 403 advisory committee's note. This is not the kind of rare and "extraordinarily compelling" case in which we would "reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." United States v. Li, 206 F.3d 78, 84-85 (1st Cir. 2000) (citation and internal quotation marks omitted). There was no abuse of discretion. See Mare, 668 F.3d at 38.

## C. The sufficiency of the evidence

Green's third claim is that the district court erred in denying his motion for judgment of acquittal. See Fed. R. Crim. P. 29. He argues, as he did before the district court, that the evidence was insufficient to establish that he was a member of the

charged conspiracy and instead proved only that he was part of a buyer-seller relationship with Tripp and Carrolton. He emphasizes that he was never captured on a wiretap or observed by law enforcement until the day of his arrest, that Tripp was unable to pick him out of a lineup, that he had no drugs on him when he arrived at the Holiday Inn Express, and that at least one other dealer, "Twin," was supplying many of the oxycodone pills for the distribution conspiracy. We review Green's challenge to the sufficiency of the evidence de novo, considering that evidence in the light most favorable to the verdict. Symonevich, 688 F.3d at 23. "A reversal is warranted only where no rational factfinder could have concluded that the evidence presented at trial, together with all reasonable inferences, established each element of the crime beyond a reasonable doubt." Id.

To support its conspiracy charge against Green, the government was required to prove beyond a reasonable doubt that: (1) a conspiracy existed; (2) Green knew of the conspiracy; and (3) Green voluntarily participated in the conspiracy.[7] United States v. Díaz, 670 F.3d 332, 347 (1st Cir. 2012). The government

---

[7] In a curious footnote in its brief on appeal, the government incorrectly claims that it did not have to show that Green had knowledge of the existence of the conspiracy or that he voluntarily joined it. Those are two of the three fundamental elements of a conspiracy charge. See, e.g., United States v. Cortés-Cabán, 691 F.3d 1, 13 (1st Cir. 2012); Symonevich, 688 F.3d at 23; United States v. Díaz, 670 F.3d 332, 347 (1st Cir. 2012); United States v. Dellosantos, 649 F.3d 109, 116 (1st Cir. 2011).

could meet that burden with direct or circumstantial evidence. Id. And while "knowledge of the broader conspiracy's existence is critical," the government did not have to prove that Green had "knowledge of every other participant, or of the details of the conspiracy." United States v. Franco-Santiago, 681 F.3d 1, 9 (1st Cir. 2012) (citations and internal quotation marks omitted). The evidence against Green was more than sufficient; we recount just some of it here.

First, Conda's testimony detailed the formation of the conspiracy, describing how Carrolton met, and began obtaining oxycodone from, Green.

Second, Tripp testified that, during the time period charged in the indictment, he repeatedly traveled from New England to Florida to obtain escalating amounts of oxycodone pills from Green. Carrolton acted as the middle man, but Tripp met Green during those transactions and testified that he was aware that Green was the source of the oxycodone pills. Tripp testified that Green supplied him with "a few hundred" pills of oxycodone at a time and that, overall, he purchased between 100,000 and 125,000 pills from Green over the course of the conspiracy. Tripp then sold about ninety-five percent of the pills to Dimas Almeida, who was involved in the drug trade in Massachusetts.

Third, Carrolton testified that somewhere between ninety-five and ninety-eight percent of the pills that Tripp obtained

through Carrolton came from Green.  Those transactions occurred about a dozen times between early 2008 and May 2009.  Carrolton testified that Tripp would fly to Florida to obtain the pills when the deals involved less than $150,000, but on at least three occasions, Tripp purchased more than $150,000 worth of pills from Carrolton and Green and thus drove to Florida in order to be able to conceal the money.  According to Carrolton, Green set the price for the pills and was present for the majority of the transactions with Tripp.

Fourth, Green arrived at the Holiday Inn Express on May 7, 2009 for what Carrolton and Tripp testified was a planned drug transaction and fled when the DEA agents identified themselves. Carrolton's toll records and the intercepted wire communications between Green's co-conspirators provided further evidence of Green's participation in the oxycodone distribution ring.

We have held that "[t]he testimony of a single witness can be enough to support the government's case, and even the uncorroborated testimony of an informant may suffice to establish the facts underlying a defendant's conviction." United States v. Meises, 645 F.3d 5, 12 (1st Cir. 2011) (internal citations and quotation marks omitted).  There was obviously much more than that in this case.  Green cites United States v. Moran, 984 F.2d 1299 (1st Cir. 1993), for the proposition that a mere buyer-seller relationship between himself, Tripp, and Carrolton was insufficient

to establish Green's knowing and voluntary participation in the conspiracy. But in Moran, we suggested that "[a] pattern of sales for resale between the same persons, together with details supplying a context for the relationship, might well support a finding of conspiracy," and that is exactly what the evidence demonstrated here. Id. at 1303; see also United States v. Rivera-Ruiz, 244 F.3d 263, 270 (1st Cir. 2001) ("[W]here advanced plans are made regarding the sale of narcotics in wholesale quantities, the participants in the transaction may be presumed to know that they are part of a broader conspiracy." (quoting United States v. Harris, 8 F.3d 943, 946 (2d Cir. 1993))). A jury could reasonably have concluded that Green participated in the charged conspiracy. See Symonevich, 688 F.3d at 23.

## D. The drug quantity calculation

Green's final claim is that the district court erred in calculating the drug quantity attributable to him as a result of his participation in the conspiracy.[8] Where, as here, a district court's drug quantity determination is fact-based, we review for clear error. United States v. Bernier, 660 F.3d 543, 545 (1st Cir. 2011).

---

[8] As part of his original appeal, Green also challenged the district court's calculation of his criminal history category, which included two points for a Florida state conviction for which Green then had an appeal pending. On July 27, 2012, after the conviction was affirmed on appeal, Green filed a notice of mooted issue with this court.

The presentence report (PSR), using the trial testimony of Carrolton and Tripp, held Green responsible for distributing at least 100,000 oxycodone tablets. That amounted to 3,000 grams of actual oxycodone, with a marijuana equivalency of 20,100 kilograms and a resulting base offense level (BOL) of 36. See U.S.S.G. § 2D1.1. In his objections to the PSR and at sentencing, Green urged the district court to reduce the amount to 748 30-milligram pills and 442 80-milligram pills -- the number of pills confiscated from Carrolton at the Holiday Inn Express on May 7, 2009 -- which would have resulted in a BOL of 32. The court found the PSR's calculation to be a "reasoned approximation" and, indeed, "a conservative one . . . with assumptions in a couple of instances in the defendant's favor." We agree.

Tripp testified that he purchased between 100,000 and 125,000 pills from Green over the course of the conspiracy. The PSR used the lower number and assumed that all of those were 30-milligram pills, when in fact Tripp testified that Green also supplied 80-milligram pills. Green claims that there were other suppliers, but the only other supplier referenced was "Twin," and Carrolton testified that somewhere between ninety-five and ninety-eight percent of the pills that Tripp obtained through Carrolton came from Green. We have held that a district court, in making a drug quantity determination, can "rely solely on the testimony of cooperating government witnesses, provided such testimony exhibits

some indicia of reliability or support from the record." <u>United States</u> v. <u>Valdivia</u>, 680 F.3d 33, 53 (1st Cir. 2012); <u>see also</u> <u>United States</u> v. <u>Rivera-Calderón</u>, 578 F.3d 78, 100 (1st Cir. 2009). Green has not challenged the drug quantity determination on the ground that his co-conspirators' testimony lacked adequate indicia of reliability. There was no clear error. <u>See</u> <u>Bernier</u>, 660 F.3d at 545.

### III. Conclusion

For the foregoing reasons, we <u>affirm</u>.